RITA JULIAN REDNOR et al., complainants-respondents,

*v.*

THE FIRST-MECHANICS NATIONAL BANK OF TRENTON, NEW
JERSEY, et al., defendants-appellants.

[Argued October 27th, 1941. Decided January 9th, 1942.]

142

On appeal from a decree of the Court of Chancery advised by Vice-Chancellor Buchanan, who filed the following opinion:

"The bill in this case seeks decree adjudicating the reinstatement of a mortgage of $50,000, or the impressing of a lien for that amount, in favor of complainants upon a certain property situate at No. 218 Parkside Avenue, Trenton, New Jersey, owned by Hannah Julian, and encumbered by a mortgage of $25,000 made by Mrs. Julian and her husband to First-Mechanics National Bank of Trenton; adjudicating also that such lien in favor of complainants is superior to the lien of the said $25,000 mortgage held by the defendant bank; ascertaining and adjudicating the amount due complainants in respect of the obligation secured by such lien; and directing the sale of the said premises in foreclosure in default of payment of said sum so found to be due.

"The facts, fully established by the proofs, and uncontradicted, are that in 1915 Isaac Goldberg, father of Mrs. Julian, caused an account to be opened in the Trenton Saving Fund Society, in the name of Hannah Julian in trust for Rita Julian (now Rita Rednor, one of the complainants), with an initial deposit of $1,000. From time to time thereafter, similar amounts were likewise given by Mr. Goldberg to Mrs. Julian in the same way for the same purposes and likewise so deposited. Similar trust gifts were also made by Mr. Goldberg to Mrs. Julian in trust for her daughter, Beatrice Julian, and likewise so deposited; and the same thing

was also true as to similar gifts likewise made to Mrs. Julian in trust for her son, Jacob William Julian. These trusts were irrevocable.

"In 1923 and from time to time thereafter, Mrs. Julian, at the request of her father Mr. Goldberg, withdrew moneys from the three trust accounts and turned these moneys over to Mr. Goldberg or to persons designated by him, for the purpose of the purchase by Mr. Goldberg therewith of certain bonds and other securities for the benefit of the children, but of a kind in which trustees were not permitted by the law of this state to invest trust funds.

"In December, 1927, the said Isaac Goldberg purchased the lands hereinbefore referred to, had them conveyed to his daughter Mrs. Julian, and caused a residence to be erected thereon for her benefit—all this as a gift from him to his said daughter. In the course of the construction of this house, Mr. Goldberg found himself short of cash, and the proofs show that from time to time he obtained moneys which he used in paying for the construction of the house, by selling or borrowing upon the bonds aforesaid which he had purchased for the benefit of the children with the moneys from the trust accounts aforesaid. The proofs are not sufficient to establish that *all* of the proceeds of these bonds—or *all* of the moneys so improperly taken from the trust accounts— went into the construction of the house aforesaid; but they do establish that a large part of these trust funds thus went into the house, and it is quite possible that all of them were so used.

"At about the time of the completion of the house, Mr. Goldberg died—in September, 1929. Neither he nor his estate, nor Mrs. Julian, nor anyone else ever repaid to the children or to anyone on their behalf, any of the moneys so improperly withdrawn from these trust accounts. Soon after Mr. Goldberg's death, the financial panic of 1929 occurred; and thereafter it developed that his estate was heavily involved and was not able to restore the trust funds to Mrs. Julian as trustee.

"Mrs. Julian became concerned about the loss sustained by the children as aforesaid, and which aggregated somewhere

around $30,000 or $35,000 in all, and on October 20th, 1932, she, having theretofore been duly appointed general guardian of the persons and property of the children, executed and delivered to herself as such guardian a bond in the sum of $50,000 payable October 20th, 1933, with interest at the rate of six per cent. per annum, payable semi-annually, and also executed, together with her husband, to herself as such guardian, a mortgage upon the residence property in question, of even date with the bond and securing the payment of that bond. This mortgage, although executed on October 20th, 1932, was not recorded until about January 4th, 1933. The $50,000 principal amount of this bond and mortgage was the approximate total amount, as calculated by Mrs. Julian, for which she was at that time liable to the children for the principal amounts of their trust funds improperly used as aforesaid, together with the interest accrued thereon up to that date.

"Mrs. Julian, individually, was at this time liable to the First-Mechanics National Bank as endorser on certain notes, and the said bank, upon learning of the execution, delivery and recording of this bond and mortgage, demanded that Mrs. Julian cancel the said mortgage. It instituted suit against her on her individual liability as endorser aforesaid, and finally induced her as guardian to cancel the said mortgage on January 23d, 1933, in return for which the bank discontinued the suit aforesaid. No consideration of any kind passed to or for the benefit of the children in return for the cancellation of this mortgage. The bank was not only on notice as to the facts hereinbefore set forth, from the fact that the mortgage was made to Mrs. Julian as guardian for her three children, but had actually been informed of all of the circumstances as to the misapplication of the trust funds and the reason for the execution and delivery of the bond and mortgage aforesaid by Mrs. Julian to herself as guardian aforesaid.

"Some four years later, on January 2d, 1937, the said bank procured Mrs. Julian and her husband to execute and deliver to it a mortgage to it upon the said lands and premises in the sum of $25,000, as security for indebtedness to the bank by

Mrs. Julian's brother, and in return for release of Mrs. Julian individually by the bank from any and all individual liabilities to it. No consideration whatever moved to the children or to anyone else on their behalf in connection with the execution and delivery of this $25,000 mortgage.

"No restitution has ever been made by Mr. Goldberg or his estate, or Mrs. Julian, or anyone else, to the children or to anyone else on their behalf, of any part of the moneys improperly taken from the trust accounts as aforesaid. The complainant children, as stated, seek the reinstatement of the canceled mortgage, the impressing of the lien thereof upon the premises in question, and the foreclosure of such lien.

"Shortly after the filing of this bill, the bank filed bill against Mr. and Mrs. Julian, and against the three children, for the foreclosure of the $25,000 mortgage; and also filed answer to the bill of the complainant children. The two suits were thereafter consolidated by order under the terms of which the bank's bill of complaint was taken as a counterclaim to the bill of the children.

"Under the proofs the bank is entitled to the foreclosure of its $25,000 mortgage as against Mr. and Mrs. Julian. The question at issue is as to whether or not the bank's rights and interests under that $25,000 mortgage are subordinate to the rights and interests of the three children. There seems no doubt but that the children are entitled to the reinstatement of the $50,000 mortgage or the lien thereof, and that the rights and interests of the bank are subordinate to these rights of the children.

"The right of the children to the reinstatement of the $50,000 mortgage, as against Mrs. Julian and her husband, is obvious. That $50,000 bond and mortgage was executed and delivered to the duly appointed general guardian of the children, and was perfectly good as against Mrs. Julian and her husband, even if it had been a pure gift, without any obligation or consideration whatever to support it. If a gift, it was a completed gift and could not be recalled by the donors. Neither did the guardian have any right to cancel it or otherwise dispose of it unless in exchange for some consideration going to the benefit of the children. Although

the legal title to the bond and mortgage was in the guardian, it was of course in equity the property of the children, and Mrs. Julian, as such guardian, had no more right to give it away than any other person or corporation as guardian would have had. Her act in giving it away—cancelling it—was a breach of her fiduciary obligation, as such guardian, to the children; and of this her husband had knowledge and participated. No waiver or ratification has ever been made by any of the children nor by anyone having any right so to do on their behalf. The children's right to reinstatement of the mortgage, as against Mr. and Mrs. Julian is perfectly clear (and has not been denied by them).

"Doubtless the rights of the children would be subordinated to the rights of the bank under its $25,000 mortgage, if the bank were a purchaser for value without notice of the equitable rights of the children; but it is perfectly clear from the uncontradicted proofs that the bank was not such a purchaser for value without notice. It gave nothing of value to, or for the benefit of, the children; and it had full and complete knowledge of the rights of the children and of the facts giving rise thereto, at and prior to the time it took the $25,000 mortgage (and it not only had this knowledge and notice, but it also appears that it had actually participated in the breach of trust committed by Mrs. Julian as guardian in the cancellation of the $50,000 mortgage).

"The knowledge of the bank, at the time it took its $25,000 mortgage, of the fact that the children were the owners, in equity, of a $50,000 mortgage on the premises, because such a mortgage given to their guardian, had been wrongfully canceled by that guardian without authority and without any consideration to, or for the benefit of, the children, was, of course, knowledge and notice of the equitable right of the children, and operated in equity to subordinate to that equitable right of the children any right in the premises which the bank would acquire, and did acquire, by taking the $25,000 mortgage—even if that $50,000 bond and mortgage had been a pure gift to the children—*unless* there is some overriding equity in favor of the bank.

"The contentions made by the defendant bank in the

endeavor to avoid the equitable right of the children—in whole or in part—are four in number. It is said—

" '1. That the transfers by Mrs. Julian to Mr. Goldberg, of the children's moneys in the trust bank accounts, for the purpose of the "non-legal" securities, were not breaches of trust on the part of either Mrs. Julian or Mr. Goldberg; that Mrs. Julian was not a trustee but a mere custodian and that Mr. Goldberg was really the trustee; that whether he or Mrs. Julian was a trustee, neither of them were violating any trust duty by investing the trust funds in the "non-legal" securities which were in fact purchased.

" '2. That the giving of the $50,000 bond and mortgage by Mrs. Julian and her husband to herself as the duly appointed guardian of the children was not in repayment of, or as security for the repayment of any indebtedness from her to her children, because no such indebtedness existed inasmuch as she had committed no breaches of trust.

" '3. That the giving of the $50,000 bond and mortgage was therefore voluntary and without consideration; and that the real reason for the giving of this mortgage was in an endeavor to defraud her creditors (including the bank); and that she was insolvent at the time.

" '4. That the trust funds in the children's bank accounts cannot be traced into the mortgaged premises—the latter do not constitute the trust funds in another form.

" '5. That the children did receive benefit and consideration as a part of the transaction which included the $25,000 mortgage to the bank.

"Let us take these up *seriatim*.

"It is difficult to believe that contention on behalf of the bank that Mrs. Julian was not a trustee of the funds deposited in the savings accounts, can be seriously intended. The proofs as to the creation of the trusts are positive and have in nowise been disputed or contradicted. On November 22d, 1915, the first birthday of Rita Julian, Mr. Goldberg gave to Mrs. Julian a check for $1,000 enclosed in a letter addressed to his little grandchild, saying, *inter alia,* that he was giving her this check 'to be deposited in the Savings Fund under the following conditions:

" '1. Princi*ple* [*sic*] not to be used or touched until you are eighteen years old.

" '2. Interest to be used, if need be *to* [*sic*] your parents discretion.'

and promising to repeat the gift each year; and at the same time he told his daughter to open a trust account in her name as trustee, for Rita. This of course constituted a gift in trust for the grandchild, with the specific provision that it should be deposited in a trust account in the Trenton Saving Fund Society; and Mrs. Julian's act in so doing was an acceptance and acknowledgment of such trust. Mr. Goldberg reserved no rights or control in, to or over the trust fund or its management or investment. On the contrary, it would seem clear from the quoted portion of his letter that there was imposed on the trust the specific limitation or condition that the principal thereof should remain invested in the savings account until Rita became 18 years old.

"The similar accounts for the other two grandchildren when they were born, were opened in the same way and on the same terms and conditions, which likewise applied to the additions annually made to the three accounts.

"There can be no question but that these savings accounts constituted trust funds in the hands of Mrs. Julian as trustee; that she had the right, if not indeed the duty, to keep them on deposit in the savings accounts; that she had no right to invest these funds in any investments not authorized by law as legal investments for trustees—if indeed she had any right to do anything at all with them except to keep them on deposit in the savings accounts; and that Mr. Goldberg himself had no right, authority or control over the trust funds, or to vary their management or investment.

"Equally of course there can be no question that Mrs. Julian's acts in withdrawing these trust funds and purchasing therewith, or turning them over to her father to purchase therewith, the 'non-legal' securities, were breaches of her trust—notwithstanding both she and her father, in so doing, were actuated by the desire to benefit the children and the belief that they were so doing. It is quite understandable that under the circumstances it would have been difficult if

not practically impossible for Mrs. Julian to have refused to accede to her father's requests in this behalf; and it is also true that breaches of trust of this kind are frequently committed in a similar way, by parents who are trustees or guardians for their children; but neither of these things can alter the legal and equitable fact that the withdrawals *were* breaches of trust and rendered Mrs. Julian and her father liable to the children therefor, or for losses thereby occasioned to the children.

"Unquestionably, then, at the time the $50,000 bond and mortgage was given by Mrs. Julian to herself as guardian of the children, she was individually indebted to the children severally, for the funds thus lost to them and which had not been repaid. The fact that Mr. Goldberg, or his estate, was also liable to the children does not alter Mrs. Julian's liability. Both were liable. Neither is it of any moment that among the assets in Mr. Goldberg's estate were, or still are, some of the 'non-legal' securities so purchased. Being non-legals, the children cannot be compelled to accept them; nor could they be so compelled even if Mrs. Julian had purported to accept them in their behalf (which she did not do).

"Unquestionably also this liability on the part of Mrs. Julian was the consideration for her making the $50,000 bond and mortgage; and it is scarcely necessary to add that it was a perfectly good, valuable and adequate consideration.

"It seems to have been—and still to be—the thought of the defendant bank, that the making of this bond and mortgage was a fraud, or at least an act in contravention of the statute against acts to delay, hinder or defraud creditors. There is not the slightest ground for the accusation of fraud. The proofs are positive, convincing and uncontroverted that Mrs. Julian *was* indebted to the children as aforesaid in an amount approximately (for principal and interest) the $50,000 face amount of the bond and mortgage; and that Mrs. Julian's purpose in making the bond and mortgage was to make repayment, or give security for the repayment, of this indebtedness. The letter of Mr. Dennis (secretary-treasurer of the Capital City Trust Company, and business associate of Mr. Goldberg), of November 12th, 1929, shows that the giving of such a

mortgage had been under consideration from a time about six weeks after Mr. Goldberg's death; and the other testimony shows that it had been delayed in the hope that repayment to the children could be obtained from Mr. Goldberg's estate. The bond and mortgage were entirely *bona fide* and had not the slightest taint of fraud.

"The fact that the bond and mortgage bear date of October 20th, 1932, but that the mortgage was not recorded until January 5th, 1933, is seized upon by the bank as an evidence of fraud. As pointed out above, fraud is absolutely disproved. Moreover the actual execution of the bond and mortgage on October 20th, 1932, is thoroughly proven by reliable testimony and is not contradicted; and it is similarly testified that it was expected and intended that the mortgage should be immediately recorded. There is no reason whatever to doubt the testimony of Mr. Budson, a lawyer of the highest reputation and standing, that the delay in recording was due to inadvertence and negligence in his office. But of course even if the recording had been intentionally delayed, it could in nowise attaint the mortgage with fraud, in view of the completely established evidence of its *bona fides* as already shown. If intentional delay in recording were established, it could be argued, at most, only that it tended to show an intent to prefer the children, as creditors, over the bank, as creditor.

"There is likewise no merit in the contention that the making of this bond and mortgage was an act in fraud of creditors under the statute. So far from being an act in fraud of creditors it was an act in payment, or protection, of creditors—the children who were actual and *bona fide* creditors. (Indeed, from a moral standpoint, Mrs. Julian's liability to them might well be deemed even stronger than her liability to the bank; she had actually taken some $35,000 away from the children, whereas her liability to the bank was upon her accommodation endorsement.)

"The bank alleged in its pleadings that Mrs. Julian was insolvent when she gave the $50,000 mortgage; but this allegation of insolvency was not established in the proofs. Moreover even if she had been insolvent at the time of making

the bond and mortgage, that fact would not have made the transaction a conveyance in fraud of creditors. An insolvent debtor may prefer certain of his creditors, notwithstanding that other creditors are thereby defeated in whole or in part. *Green* v. *McCrane, 55 N. J. Eq. 436.* If Mrs. Julian had been insolvent, doubtless the mortgage might have been avoided by the institution of proceedings in bankruptcy; but in no other way could it be successfully attacked, and this method was not attempted then, nor has it even been shown that she was insolvent then.

"The statutory provisions as to conveyances in fraud of creditors were added to by the act of 1919—*P. L. 1919 ch. 213 p. 500;* but the right of an insolvent debtor to make an honest preference to one or more of his creditors was not disturbed. See sections 3 and 4 of that act—and it is immaterial on this point whether the giving of the present bond and mortgage be deemed to have been a satisfaction of the debt to the children or a security for that indebtedness. If the latter, the amount of the mortgage was certainly not disproportionately large in relation to the debt; the two were approximately equal. The statutory provisions have remained the same ever since 1919. *Cf. R. S. 25:2.*

"It is scarcely necessary to add that not only was the giving of this bond and mortgage not in contravention of the statute, but it was in nowise inequitable. If Mrs. Julian had not done this, suit could have been brought against her by or on behalf of the children and a judgment obtained which would have been a lien on these premises just as much as was the mortgage. Since they could thus have obtained a preference by action against Mrs. Julian *in invitum,* there can be nothing inequitable on the part of Mrs. Julian in giving, or on the part of the children in receiving, such preference without suit.

"It seems to have been the belief of complainants originally that all of the misappropriated funds went into the construction of the house. Such indeed may have been the actual fact, but although the proofs do establish that a large part of the funds went into the house, they do not establish that all of the funds went into the house. It cannot be deemed,

therefore, that the house constituted the trust funds in another. form. This, however, is in nowise necessary as a basis for the relief sought by complainants. Their right to that relief rests upon the facts hereinbefore shown—that Mrs. Julian owed the children approximately the amount of the bond and mortgage which she made to them, and that she gave that bond and mortgage either intending it as a restitution of the trust *res* (it would appear to be a legal trust investment, being a bond and mortgage on real estate which appears to have been worth about $100,000), or else intending it as security for the repayment of her indebtedness. It would be immaterial if the proofs failed to establish that *any* of the trust funds went into the house, either directly or indirectly.

"Lastly, the bank contends that the children did receive a consideration at the time, and as a part, of the transaction which included the giving of the $25,000 mortgage to the bank. The evidence is clear that that transaction was one in settlement of the claims of the bank against Mrs. Julian, individually, and against her brother Milton Goldberg (and possibly others), but in which neither the children nor anyone representing their interests were involved or in any way participated; that under the provisions of that transaction Mrs. Julian gave the $25,000 mortgage to the bank, Milton Goldberg made some payment or gave some security to the bank, the bank released Mrs. Julian, individually from all liability to it, and Milton Goldberg (in consideration of Mrs. Julian's giving the $25,000 bond and mortgage to the bank, turned over to her certain securities either as payment to her therefor, or as security or indemnification therefor—her liability to the bank having been as an accommodation endorser): Assuming that this transfer of securities to her by her brother was absolute, and that she thereby became the owner thereof, she took them individually and not as guardian of, or representing, the children; and the proof is likewise· clear and uncontradicted that she never turned them, or any of them, or any proceeds from them, over to the children or to anyone representing the children. The situation is precisely the same as if she had individually borrowed $25,000 in cash and given this $25,000 bond and mortgage on her property as

security therefor. Her obtaining this $25,000 individually would not constitute any payment to or for the benefit of the children, unless and until she as an individual turned it over to the children or some one on their behalf.

"It is quite possible, of course, that the children may have derived *some* benefit, in that Mrs. Julian's receipt of the proceeds of these securities increased the assets of herself individually and hence of herself and her husband as parents of the children, and that Mrs. Julian and her husband expended moneys for the support and maintenance and education of the children. But it cannot seriously be contended that any such increased expenditures which may have been made in this regard over and above such as might have been made if Mrs. Julian had not received these securities from her brother, can be deemed to be a repayment of, or credit against, the indebtedness due from her to the children for the misappropriation from their trust funds. The maintenance, support and education of the children was a legal duty of Mr. and Mrs. Julian, notwithstanding the children may have had assets of their own.

"The children received no consideration or benefit from this transaction; and it affords no basis in equity as an estoppel against their present assertion of their equitable rights in the mortgaged premises as against the bank which took its mortgage with full knowledge of the children's prior equitable rights.

"It would seem scarcely necessary to say anything on this matter of knowledge by the bank, were it not for a curious contention or suggestion in the briefs on behalf of the bank. It is proven positively, and not contradicted, that the bank had actual and full knowledge, within a few days after the recording of the $50,000 mortgage—and prior to the cancellation of that mortgage on January 23d, 1933—of all of the facts in connection with the misapplication of the children's trust funds and the consequent indebtedness of Mrs. Julian to them, and that this $50,000 bond and mortgage had been given by Mrs. Julian to herself as guardian of the children in repayment of, or as security for, that indebtedness. It is further proven and not contradicted that the bank, notwith-

standing that knowledge and information, demanded that Mrs. Julian cancel that mortgage and told her that unless she did so they would proceed to obtain judgments in the suits it had commenced against her and her brother and others, but that if she did cancel the mortgage, it would .discontinue those suits; that the bank was told by Mrs. Julian and her counsel that she had no right to cancel it and that any such cancellation could not obviate or discharge the rights which the children had by reason of that mortgage, but still insisted that it be canceled; that Mrs. Julian, notwithstanding she was told by her counsel that she had no right to cancel the mortgage, finally decided to do so, and did do so, because of the damage it would do to her brother and the corporations in which he was interested and others as well as herself, if the bank did proceed with its suits to judgments;. and that the bank knew all this, but participated in the wrongful cancellation of the judgment by continuing and performing on its part, its demand and agreement that she should cancel the mortgage and it would discontinue its suits.

"The cancellation of the mortgage was a wrongful act on the part of Mrs. Julian, and a breach of her fiduciary responsibility and duty as guardian; and the bank knew this, or at least (what amounts to the same thing) it had been told all the facts which gave rise to that legal or equitable result, even if it disbelieved the facts or disbelieved that they necessarily entailed that result. That cancellation, therefore, cannot in equity alter the rights of the children in that property either as against Mrs. Julian and her husband, nor as against the bank when it subsequently took the $25,000 mortgage on that property, because it took that mortgage with full (legal) knowledge of the children's prior and superior rights therein.

"The fact that the bank was advised by its counsel—as seems to have been the case—that the cancellation of the mortgage would not be wrongful and that the rights which it acquired under its $25,000 mortgage would not be impaired by any superior rights of the children, of course cannot avail it as against the children. Doubtless it was natural for it to act on the advice of its own counsel, in the cancellation of the $50,000 mortgage and in the taking of the $25,000 mort-

gage, and in its contest (in the present suit) against the relief sought by the children, but in doing so it acted at its own peril and risk. It is not protected, as against the children (as is intimated in the briefs of counsel), by the fact that it acted on the advice of its counsel. Neither is it protected (as is likewise suggested) by the fact that Mrs. Julian's counsel participated in the actual cancellation of the mortgage, and in the subsequent settlement transaction which included the $25,000 mortgage. The proofs show that Mrs. Julian's counsel, in the matter of the cancellation of the $50,000 mortgage, acted on her insistence and direction notwithstanding their contrary advice and that no change ever occurred in the attitude or belief of Mrs. Julian and her counsel that she had no right to cancel the mortgage and that such cancellation even if made could not affect the children's rights in the mortgaged premises. Furthermore it is of course obvious that even if Mrs. Julian and her counsel had gone so far as to tell the bank they had changed their minds and now believed that it would be all right to cancel the mortgage, that could not bind the children nor operate to affect their rights.

"There is no doubt therefore as to the right of the children to decree reinstating the lien of the mortgage; nor as to their right to decree in foreclosure—since the mortgage debt matured due October 20th, 1933. One question arises, however, in connection with decree in foreclosure, which was not discussed in the briefs or argument—to wit, the amount which should be adjudicated as the mortgage debt due.

"If the $50,000 bond and mortgage was given and received as in restoration of, and substitution for, the original trust *res,* then the amount which should be fixed in the final decree in foreclosure as due complainants should be the $50,000 principal and interest thereon from October 20th, 1932, to date. If, however, the bond and mortgage are not to be deemed as the trust fund, but as security for the indebtedness of Mrs. Julian, then the amount to be fixed in the final decree would be the total of the several amounts wrongfully withdrawn by Mrs. Julian, plus the aggregate of interest calculated on each of such withdrawals from the respective dates

thereof down to date. It would appear that the latter amount would be somewhat less than the former. On the other hand if the bond and mortgage is to be deemed a replacement of the trust *res,* it would constitute a satisfaction and discharge of Mrs. Julian's indebtedness, and complainants' rights would be limited to the mortgaged premises; whereas, if the bond and mortgage was not a satisfaction of, but security for, Mrs. Julian's indebtedness, complainants, if the amount due them in respect of such indebtedness be not fully satisfied out of the mortgaged premises, would have the right to take further proceedings to recover such deficiency.

"It seems clear that in and of itself, the giving of the bond and mortgage did not constitute or accomplish a restoration of the trust funds or discharge of Mrs. Julian's indebtedness. This could be accomplished only by payment in cash or trust deposits in the Trenton Saving Fund Society (under the express conditions of the trust gift), or by acceptance (or consent to acceptance), by the *cestuis* or some one on their behalf, of something other than cash or such trust deposits. The bond and mortgage was neither cash nor trust deposit; moreover, it was a joint or combined asset instead of the restoration severally of each of the three trust funds.

"It is not clear from the testimony whether it was Mrs. Julian's intent that this bond and mortgage was to be deemed security for the indebtedness or a replacement of the several trust funds and discharge of her indebtedness. Assuming, however, that the latter was her intention, it would not be effective in that behalf as against complainants, both for the reasons just stated and because of the established principle that any transaction by a fiduciary involving his owner personal assets is at least voidable by the beneficiary. Unless and until it be shown that the beneficiary has acquiesced and consented, therefore, this bond and mortgage must be deemed security and not payment in discharge.

"No such acquiescence or consent by the beneficiaries is shown. Obviously, Mrs. Julian, as guardian, could not bind them in this respect—at least without an order of a court of competent jurisdiction—because her individual interests were involved in antagonism or possible antagonism to the

interests of the beneficiaries. It is clear from the complainants' bill that they have not accepted the bond and mortgage as payment and satisfaction, because the allegations and prayers are framed on the basis of the bond and mortgage being security instead of payment. It prays the ascertainment and adjudication of the amount due the beneficiaries, respectively, by reason of the breaches of trust, and decree for payment of that amount or foreclosure in default of payment.

"The computation of the amount due on this basis, including the several amounts due to each child, can doubtless be agreed upon by counsel; if not it can be referred to a master.

"The bill further prays, and complainants' counsel contends for, a decree against Mrs. Julian and the defendant bank for the amount of such deficiency, if any, as may remain after foreclosure sale—this prayer as against the defendant bank being based on the argument that the bank because of its participation in the cancellation of the $50,000 bond and mortgage rendered itself personally liable in this regard.

"It is deemed that this issue with regard to the bank need not, and indeed should not, be determined at this time. It may be that there will be no deficiency—in which event the determination would be academic; moreover such a deficiency decree against Mrs. Julian in the present suit is clearly prohibited by the statute—see *R. S. 2:65-1*—and such a decree against the bank seems equally within both the letter and the spirit of that statutory prohibition.

"The form of decree may be settled on notice. It may be mentioned that there is some doubt in the mind of the court as to the ultimate disposition which should, under the circumstances, be directed to be made of such share of the avails of the suit as may be due to the infant beneficiary Jacob William Julian, who will not attain his majority until October 3d, 1941. It is also requested that counsel consider the question as to whether Hannah Julian as guardian is not a necessary party to this suit—it does not appear by the record that she has been made a party in that capacity; and whether decree can be entered until she has been brought in as such."

*Messrs. Perlman & Lerner (Mr. Sol Phillips Perlman,* of counsel), for the complainants-respondents.

*Messrs. Minton & Dinsmore (Mr. H. Collin Minton, Jr.,* of counsel), for the defendants-appellants.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the Court of Chancery by Vice-Chancellor Buchanan.

Following the filing of the conclusions of the Vice-Chancellor a controversy developed between the parties on the application for the settlement of the form and entry of the final decree with respect to the ascertainment and computation of the amount due to the complainant in respect of the $50,000 bond and mortgage. The Vice-Chancellor consequently on April 24th, 1941, filed supplemental conclusions in which he tabulated the figures involved which were the basis of the final decree reinstating the mortgage in the sum of $50,000 and fixing the amounts due the respective parties and the priorities of liens and also fixing counsel fees.

The allowance of counsel fee of $2,500 to complainants is objected to by appellants as being excessive. Under the proofs and circumstances of this case we conclude, after careful consideration, that the counsel fee in question is not excessive.

The decree is affirmed.

*For affirmance*—THE CHIEF-JUSTICE, CASE, DONGES, PERSKIE, PORTER, COLIE, DEAR, WELLS, WOLFSKEIL, RAFFERTY, HAGUE, THOMPSON, JJ. 12.

*For reversal*—None.