75 N.J. Super. 228 (1962)
183 A.2d 89
RANDALL E. SMITH, ET AL., PLAINTIFFS-RESPONDENTS,
v.
CLIFFORD L. WHITMAN, DEFENDANT-APPELLANT,
v.
PAUL A. VIVERS, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued April 16, 1962.
Decided June 27, 1962.
*230 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Bruce H. Losche argued the cause for appellant (Messrs. Losche & Losche, attorneys).
Mr. James A. Major argued the cause for respondents (Messrs. Major & Major, attorneys for respondents Smith; Mr. Samuel M. Lyon, Jr., attorney for plaintiff-respondent Knight; Mr. Charles R. DiGisi, attorney for respondent Marino; Messrs. Morrison, Lloyd & Griggs, attorneys for respondents Maupai and Lannaghan).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant-crossclaimant, Dr. Whitman, appeals from a Chancery Division judgment setting aside certain transfers of property from defendant Vivers to him. Plaintiffs, in their several complaints, attacked these transfers as being a fraud on Vivers' creditors and sought the appointment of a receiver for his assets. The trial court held that the transfers should be set aside as the product of duress.

I.
Vivers was an attorney-at-law of New Jersey, the magistrate for two municipalities, and a member of the Bergen County Board of Elections. The several plaintiffs are acknowledged to be creditors of Vivers, who, while acting as their attorney, embezzled funds from them in the claimed total amount of $57,983.
*231 Vivers' dealings with Dr. Whitman were complex, and carried out on an attorney-client basis. They may be summarized as follows:
Dr. Whitman, an orthodontist and Professor of Orthodontistry at Columbia University, consulted Vivers in March of 1956. Although Vivers was his uncle, there had been no close relationship between the two for 20 to 30 years. Dr. Whitman wanted to purchase a home in Ho-Ho-Kus, N.J. He was, however, at that time having marital difficulties, later resolved. He also planned to build an office building, both as an investment and to house his professional offices. Vivers suggested that a corporation be formed which would take title to the new home and be used to tax advantage as a vehicle for accumulating capital for Dr. Whitman's prospective building investment.
The doctor advanced $59,000 to Vivers for the purchase of the house free and clear. Vivers, with Dr. Whitman's consent, took title in his own name pending the formation of the corporation. To reassure Dr. Whitman, Vivers gave him an unrecorded deed to the property and promised that as soon as the corporation was formed a deed to it would be executed and recorded.
The corporation, CLW, Inc. (hereafter CLW), came into legal existence early in May 1956. During the month which followed, Dr. Whitman asked Vivers several times whether he had executed the Ho-Ho-Kus property deed to the corporation. Finally, in mid-June 1956 Vivers exhibited an executed deed from himself to CLW. Although he represented that he would record the deed, he failed to do so.
In the course of the next four years Dr. Whitman contributed large sums of money and property to CLW. For example, during the corporation's first year Dr. Whitman contributed his former residence in Teaneck  soon after sold by CLW for $30,000  and almost $20,000 cash for the purchase of stock. As of 1957, the doctor's contribution to CLW, including the $59,000 for the purchase of *232 the Ho-Ho-Kus house, was just under $109,000. Dr. Whitman thereafter contributed further sums from time to time, and retained in the corporation substantially all of his profits from stock transactions. In addition, two properties he owned in Hackensack, N.J., were transferred to the corporation, and the rental income, including the $500 paid by Dr. Whitman monthly for his offices, was retained by CLW.
Dr. Whitman appears to have taken only $6,000 out of the corporation between 1956 and 1960. After the sale of the Teaneck house in 1957 he had asked that the proceeds be turned over to him. Vivers told him that the $30,000 realized from that sale had been loaned out on a 6% three-year mortgage. Although Dr. Whitman never saw the mortgage, he had no reason at that time to suspect Vivers' integrity. Accordingly, he did not press the issue.
The investments of CLW were controlled by Dr. Whitman, although the corporate officers were Vivers, his secretary (who has since disappeared) and Dr. Whitman's sister. The latter two had no business experience. Vivers kept the corporate books, but Dr. Whitman received duplicate slips from the brokerage house as stock was bought and sold by CLW. About a year after the corporation was formed, Vivers persuaded Dr. Whitman to have the certificates representing stock bought by CLW sent to the corporation office, i.e., Vivers' office, rather than have them held by the brokerage house in its street name.
On March 7, 1960 Dr. Whitman received a letter from a nearby bank asking him to secure a loan to CLW by hypothecating 50 shares of stock issued in his name. His broker had mistakenly sent the stock to Vivers. Thus, by sheer accident, Dr. Whitman discovered that Vivers had been using the CLW name to borrow on the security of stocks the doctor had bought in the company name. Vivers had manipulated the CLW loan account by withdrawing stocks as they were sold by Dr. Whitman, and replacing them with the new purchases. He had overlooked the fact *233 that the 50 shares about which the bank wrote Dr. Whitman, bore the doctor's name. The CLW bank loan stood at $45,000 when Dr. Whitman discovered what had been going on. He at once spoke to Vivers, who assured him that everything was in order. However, the doctor demanded that they meet to go over the corporate books, and they agreed to do so on March 17. Vivers cancelled the appointment; he was in Florida, or supposed to be, from March 17 to 23. The meeting was then set for March 23, but Vivers again cancelled the appointment. Dr. Whitman nonetheless went to Vivers' office, found him there and asked for an accounting. Vivers again said that everything was in order and, if given time, he could "straighten the whole thing out" by May 1. He promised to meet Dr. Whitman the next day to go over the CLW accounts.
The men met as planned. Vivers said that he did not have the corporate records with him, but offered to show his good faith by giving Dr. Whitman $20,000 in New Jersey Port Authority bonds to hold. The offer was accepted, and the bonds, which Vivers had with him, turned over to Dr. Whitman. It later developed that the bonds had been embezzled from another of Vivers' clients, and Dr. Whitman had to return them to their rightful owner.
On March 24 Dr. Whitman's broker notified him that the $45,000 CLW loan was in default, that the bank was about to resort to the stock collateral, and that a bank officer was coming to the broker's office the next day. Dr. Whitman met the bank representative there and learned for the first time that Vivers had encumbered the Ho-Ho-Kus property with a $25,000 mortgage, on which $18,930.59 was still due. (It will be remembered that Vivers had never recorded the deed to CLW.) Dr. Whitman thereupon immediately recorded the deed Vivers had given him when the house was bought.
On March 25 Dr. Whitman accompanied Vivers to Florida where their wives had been vacationing together. He did *234 not, however, question him about the loans or the mortgage; his explanation at the trial was that he wanted to investigate further. They returned on the 29th, and the next morning Dr. Whitman engaged another attorney.
Dr. Whitman and the attorney confronted Vivers at his offices on March 30 and demanded an accounting. Vivers attempted to explain the mortgage and the loan in the same way he had explained his failure to turn over the proceeds from the sale of the Teaneck property: he said he had invested in mortgages in CLW's name. However, he could not produce them. Dr. Whitman then demanded that Vivers turn over any property he had  even his wife's jewelry. He also demanded the corporation's accounts, but Vivers said the accountant had them and was on a cruise. Dr. Whitman called the accountant at his home that evening and immediately picked up the corporate tax reports.
Dr. Whitman and his attorney again went to Vivers' office on April 1. Informed that he was not in, they proceeded to the offices of General Packaging Company, a corporation in which Vivers had an interest. They found Vivers there and returned with him to his office where they demanded a complete accounting and that Vivers turn over to Dr. Whitman all the stock he held in General Packaging Company. The endorsed stock certificates, together with certain voting trust certificates, were delivered that afternoon. A few days later Vivers also transferred his 1958 Cadillac to Dr. Whitman. When the doctor and his attorney took the General Packaging certificates to the transfer agent on April 11, they were informed that the new certificates to be issued would require the signatures of two other persons, one being Vivers.
There was another meeting between the parties on April 27 at which Vivers was represented by counsel. Vivers acknowledged all of Dr. Whitman's claims and asked for time to straighten everything out. At this meeting he also admitted that the Port Authority bonds he had given Dr. Whitman belonged to another client. Vivers claimed, however, *235 that he owed no one else any money, except for a secured personal loan at the bank.
On April 30 there was a meeting at the office of Dr. Whitman's attorney. Present were Dr. and Mrs. Whitman, their attorney, Mr. and Mrs. Vivers and Mr. Vivers' attorney. At the trial Dr. Whitman was asked on cross-examination:
"Q. On April 30, what did you tell Mr. Vivers you intended to do with respect to criminal proceedings?
A. Either make good or I would go to the Prosecutor.
Q. So you told him unless he made good you would make a criminal complaint. Is that correct?
A. That is right.
Q. Therefore, this property was turned over to you.
A. Yes.
Q. To avoid a criminal complaint, isn't that so?
A. Yes."
On May 3 Dr. Whitman received from Vivers' attorney a letter dated the day before, enclosing the new General Packaging certificates made out to CLW, Inc., title papers to Vivers' 1959 Cadillac, the stock certificate and lease for his Florida cooperative apartment, his stock and membership certificates in the Ridgewood Country Club, properly endorsed, and certain property which Vivers had been holding for Dr. Whitman or CLW.
The value of assets transferred by Vivers was approximately $39,000, as found by the trial court. Included in this figure was the value of the General Packaging stock and voting trust certificates transferred on April 1 ($25,000), and the amount realized on the sale of the 1958 Cadillac transferred on April 7 ($3,500). Although in his transmittal letter of May 2 Vivers' attorney represented that the property described therein was worth $63,800, the final judgment indicates a value of only about $35,000. (The value of the 1958 Cadillac makes up the difference between this figure and the $39,000 found by the trial court.)
*236 Our analysis of the record indicates that a reasonable estimate of the total amount embezzled by Vivers from Dr. Whitman was $98,000.

II.
In the pretrial order plaintiffs contended that Dr. Whitman had obtained the transfers from Vivers without paying consideration, and with knowledge that he had embezzled their moneys. They also contended that the transfers were made for the purpose of defrauding his creditors, and at a time when he was insolvent.
Transfers with intent to defraud one's creditors were voidable at common law, but the existing rules on the subject, both in England and in this country, are founded upon statute. 3 Pomeroy, Equity Jurisprudence (5th ed. 1941, Symons), § 968, pp. 868-9. New Jersey has two statutes governing fraudulent conveyances. One is substantially the same as 13 Eliz. I, c. 5 (see R.S. 25:2-1 to 6), and the other the Uniform Fraudulent Conveyance Law (R.S. 25:2-7 to 19). It has been held that the latter statute repealed the former insofar as it is inconsistent therewith. Conway v. Raphel, 102 N.J. Eq. 531, 533 (E. & A. 1928).
We put to one side for the time being the question of duress  the ground upon which the trial court awarded judgment to plaintiffs  and consider the matter purely from the point of view as to whether the transfers were made without the payment of consideration, whether Dr. Whitman knew that Vivers had embezzled plaintiffs' monies, and whether the transfers were made for the purpose of defrauding his creditors at a time when he was insolvent.
Under R.S. 25:2-10 a conveyance made by one "who is or will be thereby insolvent is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation incurred without a fair consideration." It is not disputed that the transfers from Vivers *237 to Dr. Whitman rendered him insolvent. Were the transfers made without paying fair consideration therefor?
R.S. 25:2-9, quoted below, defines "fair consideration." The question of duress aside, the transfers in question must be said to have been made for a fair consideration, since the satisfaction of an antecedent debt is included in the statutory definition.
R.S. 25:2-13, part of the Uniform Fraudulent Conveyance Law, holds fraudulent "[e]very conveyance made * * * with actual intent * * * to hinder, delay, or defraud either present or future creditors * * *." R.S. 25:2-3, based on the Elizabethan statute, is similar. There is nothing in the record to show that Vivers was motivated by any intention to hinder, delay or defraud plaintiffs or his other creditors, or  assuming such an intention  that Dr. Whitman knew of it or participated in any degree in Vivers' undisclosed plan. Cf. Hersh v. Levinson Bros., Inc., 117 N.J. Eq. 131, 134 (E. & A. 1934). The record is clear that Dr. Whitman knew nothing of Vivers' other obligations. Indeed, Vivers' own attorney testified that during the conferences with Dr. Whitman on April 27 and 30 he had, in substance, asked his client, "Do you have any other skeletons in your house other than your involvement with Dr. Whitman? * * * Paul, if you want some help, make a complete and full disclosure at this time." On both occasions, he said, Vivers' answer was, "No, there is nothing else." Although at the time of the transfers Dr. Whitman must have realized that Vivers was handing over to him a good deal or most of his property, it cannot reasonably be said that an investigation at the moment of transfer would have disclosed plaintiffs' claims, particularly in light of Vivers' deviousness and obvious desire to conceal his financial circumstances. Cf. Unger v. Mayer, 105 N.J. Eq. 253, 256 (Ch. 1929), affirmed on opinion 107 N.J. Eq. 185 (E. & A. 1930).
Plaintiffs do not dispute the rule that a debtor may prefer one creditor to another if the preference be an *238 honest one. Hersh v. Levinson Bros., Inc., above, 117 N.J. Eq., at page 133 (citing cases); Rednor v. First-Mechanics National Bank, 131 N.J. Eq. 141, 152 (E. & A. 1941); Schwartz v. Battifarano, 2 N.J. 478, 485 (1949); Johnson v. Lentini, 66 N.J. Super. 398, 405 (Ch. Div. 1961). They claim, however, that the preference given Dr. Whitman was not an honest one, and note that the trial judge stated that the doctor's "credulity in the face of the various activities of Vivers strains belief." But this remark apparently overlooked at least two things that pervade the whole case. The first is the uncle-nephew and attorney-client relationship of Vivers to Dr. Whitman. The other is Vivers' position and reputation in the community: he was an attorney of long standing, a municipal magistrate, and a county election board member.
Hindsight would indicate that Dr. Whitman should have been suspicious of his uncle long before March 1960. But if we look at the embezzlements as of the time they took place, we can see how the victim was misled. Was Dr. Whitman obliged to run a search to see if the deed to the Ho-Ho-Kus property was actually recorded by his uncle-attorney, and that no mortgage had been placed on the property? We think not. And were it not for the broker's mistake in sending Vivers some of Dr. Whitman's personal stock, and Vivers using it as security for the bank loan he had for so long secretly manipulated, the fact that CLW's holdings had been pledged by Vivers' might not have come to light as early as it did. Again, the fact that Dr. Whitman believed Vivers' story about the $30,000 which CLW received from the sale of the Teaneck house, may well be understood in light of the relationship of the parties. One should not readily infer fraud where a client has trusted his lawyer-uncle, particularly where the latter enjoyed a good reputation.
Accordingly, we conclude that the trial judge correctly determined this phase of the case, relating purely to plaintiffs' *239 claim that the transfers were in fraud of creditors and amounted to an illegal preference.

III.
The trial judge, however, held that the transfers must fail for another reason, since they were made "in the face of a threat of criminal prosecution." This, he concluded, constituted duress and vitiated the whole transaction. He thereupon entered judgment appointing a custodial receiver and directing Dr. Whitman to surrender to him forthwith the personal property assets that had been transferred to the doctor by Vivers, having an estimated market value of $39,000. No mention was made of the 1959 Cadillac because it had been repossessed in the meantime. The judgment further provided that the complaint, insofar as the conveyance of certain real property was concerned, was dismissed with prejudice. Plaintiffs do not cross-appeal from this last provision.
The complaint is wholly silent on the issue of duress. It is not mentioned in the pretrial order. Nor was it tried by consent or without objection by the parties, in which case the issue could have been treated in all respects as if raised in the pleadings or at pretrial. R.R. 4:15-2; Grammas v. Colasurdo, 48 N.J. Super. 543, 549 (App. Div. 1958). Duress was first mentioned in the memorandum submitted by plaintiffs to the trial judge after the hearing had been concluded, apparently because of Dr. Whitman's testimony as to what had happened at the April 30 conference with Vivers, in the presence of their respective attorneys  that unless Vivers made good, Dr. Whitman would make a criminal complaint. In the answering memorandum of law which Dr. Whitman's counsel submitted to the trial judge, objection was clearly made to any consideration being given to the question of duress, since that issue had not been raised in the pleadings or pretrial order, or been tried by consent and without objection. The trial judge nevertheless proceeded to rule as he did.
*240 Before proceeding to discuss the question of duress, it is undisputed that Vivers transferred the General Packaging stock and voting trust certificates, as well as the 1958 Cadillac, before any threat of prosecution had been made. There is a complete absence of evidence as to any act of duress prior to April 30, 1960. In answer to questions directed to the conferences of March 30 and April 1, Dr. Whitman stated without contradiction that he neither threatened Vivers nor said that he was going to sue him.
The fact that the new General Packaging certificates, which required Vivers' signature as well as that of two others, were not delivered until after April 30, is immaterial. Under R.S. 14:8-27, Vivers' delivery on April 1, 1960 of the old certificates, with appropriate endorsements, transferred title to Dr. Whitman as of that date. The transfer of the 1958 Cadillac, as already noted, was completed on April 7, before any "threat" of prosecution was made. Our discussion of the question of duress, which plaintiffs press on this appeal, must therefore be limited to the other transfers which Vivers' attorney sent to Dr. Whitman's attorney under cover letter of May 2, 1961: the stock and membership certificates of the Ridgewood Country Club, the stock certificate of the Florida cooperative apartment and its accompanying lease, and the apartment furnishings.
Defendant argues that assuming the issue of duress is in the case, only Vivers may raise it  third persons (plaintiffs) may not do so, citing 5 Williston on Contracts (rev. ed. 1937), § 1627A, p. 4550. However, plaintiffs are unlike the third parties involved in the common variety of cases dealing with transfers under duress. They are creditors, vitally interested in making as much of Vivers' assets available for distribution as possible. True, they did not mention duress, as such, in their pleadings or the pretrial order, or clearly mark it as an issue at the trial. (Dr. Whitman's very brief testimony about a possible criminal complaint unless restitution were made, came into the case almost casually, in the course of cross-examination. It was not *241 further pursued by either side, and no inquiry was made of Vivers as to whether his transfers were made under compulsion of threat of prosecution.) However, plaintiffs did proceed under the banner of a claimed fraudulent conveyance, and we therefore again turn to the Uniform Fraudulent Conveyance Law to see if any provision may be considered as embracing duress.
R.S. 25:2-10, above referred to, requires a fair consideration if the claim of fraudulent conveyance is to be avoided. R.S. 25:2-9 provides the following definition:
"Fair consideration is given for property or obligation:
a. When in exchange for such property or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied; or
b. When such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained." (Emphasis ours)
These tests for determining whether fair consideration was given, look to the grantee's "good faith." Hersh v. Levinson Bros., Inc., above, 117 N.J. Eq., at page 133; Johnson v. Lentini, above, 66 N.J. Super., at page 408. The question, therefore, is whether in exchange for Vivers' transfers Dr. Whitman (1) in good faith satisfied Vivers' antecedent indebtedness, or (2) in good faith agreed to hold the property to secure that indebtedness.
If the property transferred after April 30 was transferred because of duress, this would not necessarily defeat Dr. Whitman's receipt of the property, for duress does not necessarily depend on the intent of the person exercising it. Rather, it is the effect on the person who is allegedly coerced that establishes duress  a test essentially subjective. Rubenstein v. Rubenstein, 20 N.J. 359, 366 (1956). As was said there, in the modern view "moral compulsion or psychological pressure may constitute duress if, thereby, the subject of the pressure is overborne and he is deprived of the exercise of his free will." The Rubenstein *242 court observed that duress, in its more extended sense, "means that degree of constraint or danger, either actually inflicted or threatened and impending, sufficient in severity or in apprehension to overcome the mind or will of a person of ordinary firmness, according to the earlier rule, but now, by the weight of modern authority, such as in effect works control of the will." (at page 365) And see Pomeroy, Equity Jurisprudence (5th ed. 1941, Symons), § 950a, p. 771; 5 Williston on Contracts (rev. ed. 1957), §§ 1612-1616, p. 4509 et seq.
We do not know what effect, if any, Dr. Whitman's threat of prosecution may have had on the mind of Vivers. Vivers had only one month before sought to assure the doctor by giving him $20,000 in Port Authority bonds to hold. About a week later, on April 1, after Dr. Whitman had demanded that he turn over any property he had, Vivers gave the doctor the endorsed General Packaging certificates and the bill of sale to his 1958 Cadillac. It may be that what he did after April 30 was done in an attempt to satisfy his client-nephew, who was merely insisting on restitution. On the other hand, Vivers may have given Dr. Whitman whatever else was his to transfer, in order to avoid a criminal complaint. This possibility is complicated by the fact that Vivers was attended by his attorney at the April 30 conference, and it was his attorney who, after two intervening days, sent Dr. Whitman's attorney the letter with its transfer enclosures.
Without further proof, we would have to resort to pure conjecture to determine whether Vivers was overborne by the threat of prosecution, thereby impugning Dr. Whitman's "good faith" (under the statute) in receiving the additional transfers on May 3. If the threat, in truth, overcame the mind or will of Vivers, and Dr. Whitman enjoyed the fruits of his coercion, plaintiffs, as creditors, may assert their statutory right to set aside the additional transfers received by Dr. Whitman on May 3. N.J.S.A. 25:2-15.
*243 To be taken into account in assessing the "good faith" of Dr. Whitman when he demanded and received additional transfers is the statute relating to the compounding of crimes. N.J.S. 2A:97-1 provides that any person who takes "any money, real estate, service, thing or other reward, or promise thereof, to compound, or upon agreement to compound, any offense indictable under the laws of this State," is guilty of a misdemeanor. Vivers, one of the three directors of CLW, fraudulently took or misapplied money or property of the corporation, denoted a misdemeanor under N.J.S. 2A:102-3. Did Dr. Whitman compound a crime?
The resolution of this question, which we deem necessary to reaching a just result, can only be achieved by remanding the case for the taking of the testimony of Dr. Whitman, Vivers, and the others who were present at the April 30 conference. In that way a fuller record will be achieved as to what was said and done, and the reactions of the several parties. In this connection, consideration should be given to the decision in Rubenstein v. Rubenstein on remand from the Supreme Court, reported in 40 N.J. Super. 371 (Ch. Div. 1956). Judge Conford there examined the New Jersey authorities dealing with transfers made after threat of prosecution. Analysis of his opinion indicates that he distinguished three situations:
First, if it is clear that the person intimidated into transferring his property was innocent of the offense for which prosecution was threatened, duress may be shown. Cf. Ball v. Ward, 76 N.J. Eq. 8 (Ch. 1909), affirmed sub nom. Ball v. Ball, 79 N.J. Eq. 170 (E. & A. 1911); Travis v. Unkart, 89 N.J.L. 571 (E. & A. 1916); Annotation, 17 A.L.R. 325 (1922). Second, if a crime has in fact been committed and the property is transferred as the price of an agreement not to prosecute, the law leaves the parties to the agreement where it found them. Slater v. Gittleman, 104 N.J. Eq. 172 (E. & A. 1929); and see 1 Schlosser, Criminal Laws of New Jersey (rev. ed. 1953), *244 §§ 523, 524, p. 254. Third, where a debtor is merely reminded of his legal obligation and told that unless he lives up to that obligation, the sanctions of the criminal law will be invoked, Rubenstein v. Rubenstein, above, 40 N.J. Super., at pages 390-391; or, more generally, where an agreement to stifle prosecution is not established, Bodine v. Morgan, 37 N.J. Eq. 426 (Ch. 1883). Cf. Mullin v. Leamy, 80 N.J.L. 484 (Sup. Ct. 1911).
We have in this case a situation not present in cases like those just cited, namely that this action was not brought by Vivers to avoid his transfers, or by Dr. Whitman to affirm them, but by Vivers' creditors. They, as already emphasized, attacked the transfers as in fraud of creditors because the threat of prosecution negates the "fair consideration," with its element of Dr. Whitman's "good faith" called for by the Uniform Fraudulent Conveyance Act, cited above. Since there was actual embezzlement by Vivers, this case can be considered as falling within only one of the last two situations considered in the Rubenstein remand, just mentioned.
The cases are few where creditors have sought to set aside their debtor's transfer of property to another creditor on the basis that part of the consideration for the transfer was an agreement to stifle criminal prosecution. In Traders' National Bank v. Steere, 165 Mass. 389, 43 N.E. 187 (Sup. Jud. Ct. 1896), the court noted that the law leaves parties to a transaction involving the compounding of a felony where it finds them, but that creditors of an insolvent transferor may in such case apply the transferred property to the debts owed them. However, the court held that where the transferee was himself a creditor, payment to him was not fraudulent. It said:
"* * * The added illegal element in the contract is condemned by the law because it is against public policy, but it does other creditors no harm. The money paid is no more than his due for the debt, and nothing is taken from the other creditors for an illegal use. * * * They are affected as all other members of the *245 community are affected, and not otherwise. If it were possible to do so, they would have no right to use the debtor's liability to punishment for his crime as a means of obtaining an advantage to themselves. * * *" (165 Mass., at page 393, 43 N.E., at page 187)
Accord: Merchants Bank v. Page, 147 Md. 607, 128 A. 272 (Ct. App. 1925) (dictum). And cf. the line of cases, Hall v. Hart, 52 Neb. 4, 71 N.W. 1009 (Sup. Ct. 1897); Brower v. Fass, 60 Neb. 590, 83 N.W. 832 (Sup. Ct. 1900); and Johns & Sandy v. Reed, 77 Neb. 492, 109 N.W. 738 (Sup. Ct. 1906), holding that where the entire consideration is illegal, creditors may set the transaction aside, but only if they can show that their rights were prejudiced. In this connection, see also the annotation in 34 A.L.R. 1297 (1925).
The cited Massachusetts and Maryland cases say, in effect, that if the consideration for a debtor's preference is composed of two elements, one legal and in itself sufficient to support the transfer, and the other illegal, the illegality may be disregarded. However, in the later Massachusetts case of Wolff v. Perkins, 254 Mass. 10, 149 N.E. 691 (Sup. Jud. Ct. 1925), it was held, on facts similar to the Traders' National Bank case, that an agreement to pay creditors in an effort to settle a criminal case was illegal, and the result is the same if only part of the consideration is illegal. Such an agreement was held against public policy, and not enforceable.
New Jersey does not recognize the distinction between part and all of the consideration being illegal. Jourdan v. Burstow, 76 N.J. Eq. 55 (Ch. 1909), affirmed on opinion 78 N.J. Eq. 587 (E. & A. 1911), which quoted with approval from Haynes v. Rudd, 102 N.Y. 372, 7 N.E. 287 (Ct. App. 1886). See also Union Exchange National Bank v. Joseph, 231 N.Y. 250, 131 N.E. 905, 17 A.L.R. 323 (Ct. App. 1921) (Cardozo, J.), which followed the Haynes case; 5 Williston, op. cit., § 1616, p. 4516. Cf. Slater v. Gittleman, above, 104 N.J. Eq. 172 (E. & A. 1929).

*246 IV.
So much of the Chancery Division judgment setting aside the transfers made on April 1 and 7, 1960, after the March 30 meeting, as in fraud of creditors, is reversed. The matter is remanded for the taking of testimony as to whether there was coercion of Vivers on April 30 resulting in the later transfers, in the light of what was said by the Supreme Court in Rubenstein. Also to be explored is whether the compounding of a crime attended the arrangement reached by Dr. Whitman with Vivers on the latter occasion.