MATTHIAS C. EATON v. JAMES M. C. EATON.

1. If a deed be read falsely to a man too infirm to read it himself, or if the contents be untruly stated to him, it may for that reason be avoided at law; but if he be simply misinformed as to its legal effect, it cannot be avoided in a court of law, but a court of equity will correct or reform the deed.

2. The degree of evidence required to defeat such deed should be sufficient to carry strong conviction to the minds of the jury of its truth.

3. The test of capacity to make a deed is, that a person shall have the ability to understand the nature and effect of the act in which he is engaged and the business he is transacting.

Eaton v. Eaton.

4. The deed of conveyance of a person of unsound mind, executed before an inquisition and finding of lunacy, if taken in good faith is voidable only, and not void.

5. A voidable deed may be ratified by acts of acquiescence after the disability is removed; but the acts of confirmation to establish the deed, must show an intention to confirm it with knowledge of its character and that it is voidable.

On rule to show cause why a new trial should not be granted in the above stated cause, tried at the Essex Circuit, April Term, 1873.

James Eaton, of Irvington, Essex county, died January 25th, 1853. He left four sons, James, Thomas, George and Matthias, and his wife Phebe, surviving.

Matthias, the plaintiff, was about fourteen years old when his father died; and James, the defendant, aged about twenty-five years. After the death of his father, James, the eldest son, claimed to have the possession, control and ownership of all the lands his father had owned, under deed from his father and mother, James Eaton and Phebe, his wife, dated January 4th, 1853, duly acknowledged and recorded.

After differences and disputes between the parties about the title continued for several years, this action of ejectment was brought by Matthias, the youngest son, to recover his undivided fourth of three lots of land, part of the father's real estate, still in possession of James.

The case was tried before Justice DEPUE, and resulted in a verdict for the plaintiff.

Argued at February Term, 1874, before BEASLEY, Chief Justice, and Justices WOODHULL, VAN SYCKEL and SCUDDER.

For the defendant, *Coult*.

For the plaintiff, *T. N. McCarter*.

Eaton v. Eaton.

The opinion of the court was delivered by

SCUDDER, J.  The plaintiff is one of the sons of James Eaton, and by our statute of descents entitled, at his father's death, to one equal undivided fourth part of the lands of which his father died seized, in fee simple, without devising the same in due form of law, subject to the dower of his mother, Phebe Eaton.

The defendant, James M. C. Eaton, denies that the father died seized of the lands claimed in this suit, and produces a deed duly executed by his father and mother, dated January 4th, 1853, covering this property and all the lands owned by their father at that time, as evidence of his title and exclusive ownership.

The deed is attacked by the plaintiff upon two grounds. First, that at the time the deed was executed, it was a fraud upon his father, who was paralytic and imbecile, and being unable to read and understand the contents of the deed, they were falsely stated to him and to his wife, not in legal effect only, but in the very description of the writing itself; that it was represented to be a deed in proper form to James to enable him to manage and dispose of the property for the payment of some debts of the father, which were troubling him because he was not able to look after his business as he was wont, and some of his creditors were becoming urgent. A Mr. Miller, to whom the father owed $1500, secured by mortgage on lands, had, just before the drawing of the deed, threatened the old man with a suit for its recovery, and told him " he could get no satisfaction from him, and that if he could not do it himself, he was to put it in James' hands to do it for him."

Upon this threat and suggestion, one Mr. Van Houten, a scrivener, was called upon by some one to draw a deed, and made it an absolute conveyance of all the father's lands to his son James.  The old man's hand was guided while he signed the deed.  The mother refused to sign at first, but finding her husband was becoming excited and angry, as she says,

Eaton v. Eaton.

was induced to sign from fear of the effect of her refusal upon her husband.

Van Houten is dead, and there was no witness to speak of the execution of this paper but Phebe Eaton, the mother, who is now living with the other sons, and is opposed to James.

The court properly instructed the jury that the duly executed deed held by James; his possession, which immediately followed the death of the father, January 25th, 1853; the death of Van Houten; and the length of time which had elapsed since the transaction, imposed upon the plaintiff the obligation of producing before the jury proof which should carry strong conviction to their minds of the truth of the matters upon which the right to recover must depend.

The court also charged upon the allegation that the deceased was deceived as to the contents of the deed, that "every person is presumed to know the contents of a deed to which he affixes his seal. If he is illiterate or impaired in intellect, the deed should be read over to him or he should be informed of its contents. If it is read falsely to him, or if the contents of the deed be untruly stated to him, he may, for that reason, avoid it at law; but if he is simply misinformed as to its legal effect, he cannot avoid it in a court of law, but must go into a court of equity to have the deed corrected or reformed." A better statement of the law applicable to the case could not be made. There is obviously great danger in permitting parol proof of this nature to be used in opposition to a deed, executed with all the formalities of the law; but it is competent, when fraud is charged in the execution of the deed, to show such fraud by parol testimony, although the effect may be to annul the solemn deed of the party.

The law, in its hatred of fraud, allows such evidence to be used. It must, however, be of such strength that it shall carry conviction to the minds of fair and intelligent jurors; and they must understand the danger to titles thus attacked, and the disturbance of the security which the owners of property feel when deeds are thus annulled by what is deemed an inferior kind of testimony.

The defendant can make no reasonable objection to the directions of the court upon these points, which were stated distinctly and favorably for him in the charge to the jury.

There can be no doubt upon the evidence of the defendant, James M. C. Eaton himself, that the well understood purpose of the deed was not to make an absolute conveyance to him for a consideration that was paid, or was to be paid by him. His father had had a stroke of paralysis, and, by it, had been changed from a robust, active business man, to a weak, crippled, and disordered invalid. In this condition he was harrassed by his business obligations. His property, as appears by the evidence, was ample to pay all his debts, but he was not able, physically or mentally, to use and apply it. There can hardly, under such circumstances, be a more touching picture drawn than that given by James in his evidence, relating the first conversation of his father with him upon this subject, as they were riding in the wagon together from Elizabeth, after the attack of paralysis. He says : " He appeared to be very desponding and low-spirited ; he said he had labored a lifetime to gain a competency, and had failed, and did not know what to do ; he said I had been a true friend to him, and I should not lose a cent ; I told him to struggle on, and I would do what I could to help him ; he said, if something was not done, mother would have to wash for a living ; he said George and Matthias were boys, and spoke of Tom ; he seemed affected, and cried." They had just been paying off a judgment against the father.

His statement, also, of the reason that induced him to take the deed is peculiar. " He said I had better take it—it would be of use to me, some time or other ; I was to take it and get through with it." It is nowhere said in his evidence that it was a purchase for a stipulated price ; but all the evidence shows it was a conveyance for a purpose. That purpose was to pay the debts and provide for the family with the balance—to put the son in the place of the father, to effect this design. These debts have been satisfied ; the property still remaining has greatly increased in value, and the defend-

ant claims to hold these lands by an absolute deed of conveyance. Such claim, under the testimony, the jury have said by their verdict, is a fraud, and the deed a nullity. They find that the deed was either not read to the father and his wife, or falsely read, or the contents untruly stated to them, and there is much evidence in the cause to corroborate the testimony of old Mrs. Eaton, the mother, and sustain the finding of the jury.

The second issue in the case was, that the mind of James Eaton was so impaired by disease that, in law, he was incompetent to make a conveyance of his property.

The test of capacity to make an agreement or conveyance is, that a man shall have the ability to understand the nature and effect of the act in which he is engaged, and the business he is transacting. He may be old ; he may be enfeebled by disease ; he may be irrational upon some topics, but, in the absence of fraud and imposition, he may still execute a valid deed, or other disposition of his property"; but if the mind be so clouded or perverted by age, disease, or affliction, that he cannot comprehend the business in which he is engaging, then the writing is not his deed.

There is much testimony in the case upon this point, and it is conflicting.

In October, 1850, he had the first attack of paralysis, and was confined to his bed, under medical treatment, for three weeks. When he arose his left side was paralyzed, his mouth and the left side of his face were drawn, and the saliva ran from his mouth. He had difficulty in talking so as to be understood, and walked in a crippled manner about the house and neighborhood, with some member of the family looking after his safety almost constantly. In November, 1851, about ·one year after the first attack, he had a second, of about the same character as the former, and on January 24th, 1853, about three weeks after the execution of the deed in controversy, he had a third, which proved fatal.

His mental state, after the first two attacks, is therefore the subject of inquiry. His physician, who attended him through

the three attacks, says of his condition when first called to see him, that "he was entirely helpless—his mind seemed to be entirely gone—he had no mind; I attended him regularly for some weeks after the first attack, until I thought I could leave him and not go every day, but he was so that it was necessary he should be constantly watched from going out of doors and kept from excitement and undue influence of every kind; I considered it absolutely necessary that due care should be observed."

He also said that he was evidently worse, both in mind and body, after the second attack; and further, that this continued to be his condition, although he seemed at times more able to help himself, and that he was totally unfit to transact business or make bargains. He also said that his son James, the defendant, in conversation, agreed with him as to his condition.

There are other witnesses who testify to the same effect; while the defendant's witnesses say that he went about alone, talked with difficulty but intelligently; and with his son James, and sometimes by himself, received money and gave receipts for rent, &c. The facts and details were given with great particularity by the witnesses, but this general summary is sufficient for the purpose of showing that the jury did not reach their conclusion without evidence; nor do I think there is any preponderance in the evidence against the verdict. It was a case of conflicting testimony, proper for the decision of a jury, and nothing in it to warrant the interference of this court as a legal result from the evidence. No passion, strong prejudice, or finding, against the clear weight of testimony, is manifest.

If it be assumed that the verdict is sustained by the evidence upon this point, it is still further contended by the defendant's counsel that the deed of a person of unsound mind is not void, but voidable, and may be ratified by long acquiescence, and by permitting the grantee to do acts by which his condition is changed, and which will prejudice him if the deed is defeated. The difference between a void and

a voidable deed, as defined in the law, is that the former cannot be ratified by acquiescence short of the statutory limitation, while the latter may be, by time and circumstances, within such limitation.

It was held by the court in this case below, that a deed made by a person of unsound mind is voidable and not void, and therefore the evidence of acts of acquiescence was admitted to go to the jury.

This ruling was in favor of the defendant, and the position of the case here, upon his motion for a new trial, stands rather upon the weight of that evidence than upon the legality of the ruling. But if there was error in this holding, then the case is decided by the points already considered, and we need not further examine the question of acquiescence and acts of ratification. An examination of the cases upon this subject shows much conflict and some uncertainty. Our usual text book, 2 *Bla. Com.* *291, says : " Idiots and persons of non-sane memory, infants and persons under duress, are not totally disabled to convey or purchase, but *sub modo* only. For these conveyances and purchases are voidable, but not actually void. But it hath been said that a *non compos* himself, though he be afterwards brought to a right mind, shall not be permitted to allege his own insanity, in order to avoid such grant, for that no man shall be allowed to stultify himself, or to plead his own disability."

It will be observed that he further calls this rule, (that a man may not stultify himself in court,) " a notion "—and so it has been held, for it has been long exploded.

2 *Sugden on Powers* *179, says that Blackstone followed the old rule in *Beverley's Case*, 4 *Rep.* 123, that deeds executed by lunatics were voidable only, but not actually void; but that *Thomson* v. *Leach*, *Comb.* 468 ; *S. C.*, 3 *Salk.* 300, established the distinction, that a feoffment with livery of seizin by a lunatic, because of the solemnity of the livery, was voidable only, but that a bargain and sale, or surrender, &c., was actually void.

What becomes of this distinction under our law relating to conveyances, which abolishes liveries and substitutes deeds of bargain and sale with acknowledgment and record for the old common law mode of conveyance by feoffment with livery of seizin, must be apparent. The recorded deed has the publicity which was obtained by the formal delivery of possession of the land by livery. Because of the solemnity of the livery the feoffment was voidable, but to prevent secret conveyances the deed was made void.

If the rule no longer obtains that a man may not stultify himself in court, and a complete title is given without livery of seizin and actual corporeal investiture, there would be no reason for adhering to the law that a feoffment by a person of unsound mind is voidable, while a deed of bargain and sale is absolutely void.

A better reason for the absolute avoidance of a deed executed by persons of unsound mind, would seem to be that they who have no mind cannot agree in mind with another, and as this is the essence of a contract, they cannot enter into a contract. But, how is this degree of unsoundness to be determined so as to give protection to those who contract or take conveyances from such persons in good faith, for a good consideration? There would appear to be good cause to hold that deeds made by lunatics, found such by commission and placed under guardianship, are void; but before such adjudication, the rule that holds such deeds voidable, is sufficiently stringent. There is no good reason for putting such persons under a stricter law than that which obtains in case of infancy, where there is also no consenting mind because of immaturity and lack of experience. In dealing with an infant the purchaser has notice, but in trading with an insane man, he may have none. It will be observed that Blackstone classes infants with persons of non-sane memory, and there has been the same controversy with reference to the deeds of infants whether they are void or voidable. 2 *Kent's Com.* \*235, and notes; *Bool* v. *Mix*, 17 *Wend.* 119; *Zouch* v. *Parsons*, 3 *Burr.* 1794; *Ownes* v. *Ownes*, 8 *C. E. Green* 63.

But the weight of authority is decided that deeds or instruments under seal executed by infants, are voidable only, with the exception of those which delegate a naked authority; they are void.   The recent case of *Dexter* v. *Hall*, 15 *Wall.* 9, (1872,) holds that the power of attorney of a lunatic, or of one *non compos mentis*, is void ; but the opinion of Justice Strong goes further and assails the entire doctrine that the deeds of persons of non-sane mind, are only voidable, not void. In the argument of this case and the opinion of the court, will be found references to the most important cases, and a full discussion of the subject.

While it is doubtless the settled law in England, confirmed by act of Parliament, 7 *and* 8 *Vict., ch.* 76, § 7,[*] that a conveyance by feoffment or other assurance, as well as a deed of bargain and sale, release or grant by an idiot or lunatic, is wholly void, yet the weight of authority in this country favors the rule that the conveyance by deed, of persons of non-sane mind and of infants, are voidable and not wholly void.   1 *Pars. on Cont.* *283; 3 *Washb. R. Pr.* *558 ; 4 *Kent's Com.* 450 ; *Dart on Vend. & Pur.* 3 ; 1 *Story's Eq.*, §§ 222, 228.

The leading cases in the different states will be found in the notes of these text books.

The cases referred to in the charge at the circuit, *Allis* v. *Billings*, 6 *Met.* 415, and *Arnold* v. *Richmond Iron Works*, 1 *Gray* 434, agree with the present case.

In *Gibson* v. *Soper*, 6 *Gray* 279, it was held that an insane person, or his guardian, may bring an action to recover land, of which a deed was made by him while insane, which deed has not since been ratified or confirmed, without first restoring the consideration to the grantee.   The reason given is plausible.   Thomas, J., says :  " To say that an insane man, before he can avoid a voidable deed, must put the grantee in *statu quo*, would be to say in effect, that in a large majority of cases, his deed shall not be avoided at all.   The more insane the

---

[*]7 & 8 *Vict., ch.* 76, § 7.—" That no conveyance shall be voidable only when made by feoffment or other assurance where the same would be absolutely void if made by release or grant," &c.

grantor was when the deed was made, the less likely will he be to retain the fruits of his bargain, so as to be able to make restitution. If he was so far demented as not to know or recollect what the bargain was, the difficulty will be still greater."

This is good law where there is fraud practiced upon one who is known at the time to be insane, but is not the law where the purchase and conveyance are made in good faith, for a good consideration and without knowledge of the insanity; not only must the consideration be returned in such cases before the conveyance will be avoided, but courts of equity and courts of law have gone further, and held that where persons apparently of sound mind and not known to be otherwise, enter into a contract which is fair and *bona fide*, and which is executed and completed, and the property, the subject matter of the contract, cannot be restored so as to put the parties in *statu quo*, such contract cannot be set aside either by the alleged lunatic or those who represent him. *Yauger* v. *Skinner*, 1 *McCarter* 389; *Molton* v. *Camroux*, 2 *Exch.* 487; *S. C.*, 4 *Exch.* 17.

It is not clear, from the facts of this case, that the knowledge which the defendant had of his father's condition, the doubts raised by the testimony respecting the consideration alleged to have been paid, and the means he had for such payment, together with his conduct since he came in possession, in repudiating the arrangement made after the debts and encumbrances have been nearly paid from the income and proceeds of such property, do not constitute such fraud, that the question of restoring the consideration does not arise in this case.

The judge, however, took a view of the case more favorable to the defendant, for he held that so far as the payment of encumbrances was included in the alleged consideration, that should be left out of the case, because if, as tenant in common, the defendant paid such encumbrances, he could retain his lien on the property for the purpose of reimbursing himself. But the other facts of payment of debts, which the

defendant alleged he had paid to himself and others, amounting to $870, as part of the consideration, and the $1000 which the defendant says he advanced to the plaintiff, or loaned to him, and which the plaintiff claimed in a former suit, was paid to him on account of the trust claimed in this suit, all these were left to the jury, and they have passed upon them.

The deed being, therefore, voidable and not void, if the father, James Eaton, was *non compos* when it was executed, the only question that remained for consideration was, whether the plaintiff, by his acquiescence and acts, had ratified the deed.

This he might do. It is not necessary that the time should elapse, after the removal of the disability which would bar a recovery by the statute of limitations. A shorter time of acquiescence, with the intervention of matters which prejudice the grantee, and place him so that he cannot be put in *statu quo* will prevent the avoidance of the deed.

The plaintiff was about fourteen years old when his father died, and he waited eleven years after he was of full age before this action of ejectment was brought. Meanwhile the defendant disposed of portions of the property and paid the encumbrances. He also mortgaged the property and advanced the plaintiff $1000, which the latter testified was paid him on account of the trust claimed in this suit. But if James was holding the lands, under the deed from his father, as a trustee for the payment of debts and encumbrances, and was thus acting in these payments according to the understanding of Matthias, it will hardly be said that the acquiescence of the plaintiff in such acts would prevent him from asserting his right when the defendant claimed to hold under an absolute deed, and denied the plaintiff's interest in the balance of the premises. The acts of confirmation to establish the deed must show an intention to confirm it, with knowledge of its character, and that it is voidable. *Tucker* v. *Moreland*, 10 *Pet.* 64.

All these questions of fact were fully and fairly left to the jury by the court, and they have passed upon them.

Both points, therefore, taken before the jury, that the defendant's conduct was fraudulent, and he imposed on his father, taking advantage of the weakness of his mind, to obtain from him an absolute conveyance of his lands without a fair consideration; and that the deed is voidable and has not been ratified, have been found by the jury for the plaintiff. This court see no mistake in the charge upon the law applicable to the case, and think there is evidence sufficient to sustain the verdict.

The motion for a new trial is refused.