885 A.2d 482 (2005)
381 N.J. Super. 217
Ralph JENNINGS and Sylvia Jennings, Plaintiffs-Appellants,
v.
John T. REED and Rebecca Reed, husband and wife; Robert Rosania, Jr.; Al Wolfe; James Reed; J.R. Land, Inc.; Independent Tree Service; GPU Energy, Inc., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted October 24, 2005.
Decided November 10, 2005.
*484 Wayne A. Schultz, Chester, attorney for appellants.
Taylor, Colicchio & Silverman, Princeton, attorneys for respondents, J.R. Land, Inc.; James Reed; Robert Rosania, Jr. and Al Wolfe (Frank Lo Bosco, on the brief).
Before Judges LINTNER, PARRILLO and GILROY.
The opinion of the court was delivered by
PARRILLO, J.A.D.
Plaintiffs, Ralph and Sylvia Jennings, husband and wife, appeal from the Law Division's grant of defendants' motion to enforce a consent order of settlement entered into among the parties and placed on the record in open court. For the following reasons, we affirm.
Plaintiffs sued their neighbors, John and Rebecca Reed, together with a number of other individuals and entities (collectively defendants)[1], in a dispute over use of a common driveway by easement shared by the Jennings and the Reeds. In their seventeen-count complaint, plaintiffs alleged that defendants repeatedly trespassed, tore down and removed mature *485 trees, shrubs, flora and grass; changed the grade of, and fresh water runoff on, the rear portion of their property; dumped excavated dirt and debris in the same location without permission; and engaged in a conspiracy designed to annoy, harass and intimidate them. Defendants answered, denying these allegations and asserting various defenses and counterclaims.
Following discovery, unsuccessful mediation, weeks of settlement conferences involving exchanges of draft proposals, and adjournment of the first trial date, a peremptory trial date was fixed for January 26, 2004. On January 22, 2004, the eve of trial, as a result of a final settlement conference conducted by the judge, the attorneys for the parties negotiated a settlement. The settlement discussions lasted more than three-and-one-half hours during which Ralph Jennings (Jennings) participated with counsel and successfully negotiated alterations to the agreement. At the conclusion of negotiations, counsel advised Jennings not to sign the settlement agreement if he believed it was achieved through duress. Jennings proceeded to execute the settlement agreement on behalf of himself and his wife, Sylvia, who was not present at the conference. The settlement agreement was then placed on the record, but outside the presence of Jennings, who by then had left the courthouse to call another attorney and to visit his psychiatrist across the street.
More than three weeks later, on February 17, 2004, plaintiffs on their own sent an ex parte letter to the judge indicating displeasure with the settlement, although failing to identify any provision or term thereof with which they disagreed. Yet, despite their expressed objection and the court's rejection of their ex parte communication as improper, plaintiffs never thereafter moved to vacate the settlement. Instead, on February 18, 2004, their counsel sought to be relieved from further representation, and two days later, on February 20, 2004, defendants cross-moved to enforce the agreement. By order of April 30, 2004, counsel's request was granted, but defendants' enforcement motion was adjourned to allow plaintiffs time to obtain substitute counsel and file opposition, which they did on May 30, 2004.
Plaintiffs' opposition was based on the dual claims that Jennings lacked both the mental capacity to consent and the authority to consent on behalf of the absent Sylvia. In support of these claims, plaintiffs submitted four certifications: one from each of them; one from their "personal" lawyer, Steven Caputo; and one from Ralph's psychiatrist, Dr. Jay Kuris. Although he admits being "given the authority to negotiate a settlement on [Sylvia's] behalf", Jennings certified that he ". . . signed the settlement even though I did not agree to it . . ."; and ". . . made it abundantly clear to my counsel that I believed I was being coerced into signing the settlement agreement. . . ." Likewise, although she too did not deny giving her husband authority to negotiate a settlement, Sylvia insisted she did not "authorize[] anyone . . . to enter any settlement on the record . . ."; and ". . . did not approve of the [settlement terms]". (emphasis added).
Caputo, who was not plaintiffs' attorney of record in this matter and never entered an appearance, made a similar distinction, certifying that ". . . Mrs. Jennings had not given anyone . . . the authority to enter a settlement on the record . . . ." (emphasis added). Caputo also certified that he . . . confirmed with Sylvia Jennings that the agreement was totally overreaching and unacceptable to her"; and ". . . determined that she was not in agreement with the settlement agreement . . .".
*486 Finally, Dr. Kuris, who examined Jennings shortly after the settlement agreement was executed, opined that he "was in no condition nor capable of making a rational decision that afternoon." Dr. Kuris attributed Ralph's anxiety to a long-standing condition:
Due to length of these stressful situations and being forced to endure years of severe emotional stress, beyond which any reasonable person could endure, has resulted in their psychiatric injuries becoming more entrenched and chronic.
Defendants did not submit any medical testimony as to Jennings' mental condition. However, defendants' attorney filed a certification in which he stated that on the day of settlement, plaintiffs' counsel advised that Jennings had the authority to negotiate a settlement on behalf of his wife; that many of the changes demanded by Jennings during the conference were incorporated into the final agreement; that Jennings was advised by his counsel not to sign the agreement if under duress; and that Jennings informed his attorney, in the presence of defendants' counsel, that he was voluntarily signing the agreement. Defendants also point to the record at time of settlement wherein plaintiffs' counsel informed the court:
Mr. Jennings had instructed me, over the past month, not to engage experts; not to retain experts and pay retainer fees; that it was his intention to settle this case.
. . . .
Mr. Jennings has had more than ample time to weigh this case. He has told me several times that it was going to settle. And this is not the first time that he has engaged with me in a fiery altercation, always all of his doing. I don't really know what I can do. I made sure that I asked him if he was signing under duress, and he indicated no.
With the consent of both parties, the motion judge decided defendants' application to enforce settlement on the basis of the certifications, without taking any live testimony. He found:
[G]iven those facts  which are undisputed  I find, at least for the purposes of executing that document, that there was apparent authority on behalf of Mr. Jennings to sign on behalf of Mrs. Jennings. I just could not have a situation where, after something is signed on behalf of both  and there's no separate representation  that the second party says well, you know, I was merely consulted. There's nothing on the record to indicate, again, any separate representation. There's got to be more than a late claim of . . . my husband really didn't have the authority to b[i]nd me. I think we'd have a very chaotic situation if we allowed that kind of procedure to occur. And the steps were not taken here.
The second operative fact[:] . . . [plaintiffs] never moved to fax [sic] a settlement, per se. They initially filed an improper letter with Judge Bernhard, several weeks after the hearing, which he rejected. And it was only when there was a motion to be relieved as counsel that they responded with any indication that there was some dissatisfaction with the settlement, in any formal or legal way. And that was really. . . four to six weeks after the event.
And then, we have their responses to the motion to enforce. . . . And even to this day, we have no request for affirmative relief  a request to void. Just, we have . . . the motion to enforce. . . .
The third fact is that . . . nothing, in any of the documents, which claims incompetence  as that category is traditionally recognized. There is a claim of *487 anxiety . . . it's repeated again and again in all the certifications; that there was a question of anxiety here and whether the . . . settlement was signed, as a result of anxiety or severe emotional distress. Again, the word "incompetence" has some meaning. The word "lack of capacity." Those words  as a result of incompetence or some injury  have some meaning. Anxiety or emotional distress, in connection with a lawsuit, is something many of us feel; whether you're trying the case or a party to the case.
. . . .
Now, with respect to the Kuris certification  again, assuming it's true at the moment  there is no finding of incompetence in that certification. The reference to the condition  the anxiety  again, is a reference to the lawsuit and really, nothing further. And one can draw from that inference that if everybody signs a settlement, then they decide they don't like and goes running to a physician and says the devil made me do it, I think . . . we'd be undermining or giving parties a very easy out, with respect to settlements. Again, I'm accepting Dr. Kuris' statements as true.
. . . .
But, it does strike me  without any need for any further hearing  that these statements; these sets of statements, made under these circumstances, are not the proper foundation for a diagnosis. And when you add to that that the diagnosis is a rather vague one  not related to any recognized category that I can determine of incompetence, inability to understand, incapacity  then it appears to me that even accepting the statements as  even accepting what's said in here as an accurate rendition of what was said to . . . the doctor  that the affidavit, itself, is not probative on the issue of incompetence of incapacity to the consent.
On the basis of these findings, the motion judge granted defendants' application to enforce the settlement. Plaintiffs have appealed, arguing there was no "meeting of the minds" giving rise to an enforceable agreement, and that in holding otherwise, the court erred as a matter of law. We disagree.
As a threshold matter, we note that the judge, with the consent of the parties, ruled on the basis of conflicting certifications without an evidentiary hearing. We find no deprivation of fundamental fairness in this instance given the parties' consent to the procedure and, more significantly, because plaintiffs would not be entitled to have the settlement agreement vacated even if they proved their allegations.
We start with the fundamental principle that "[t]he settlement of litigation ranks high in our public policy." Jannarone v. W.T. Co., 65 N.J.Super. 472, 476, 168 A.2d 72 (App.Div.), certif. denied, 35 N.J. 61, 171 A.2d 147 (1961); see also Nolan v. Lee Ho, 120 N.J. 465, 472, 577 A.2d 143 (1990); Dep't of Pub. Advocate v. N.J. Bd. of Pub. Util., 206 N.J.Super. 523, 528, 503 A.2d 331 (App.Div.1985); Pascarella v. Bruck, 190 N.J.Super. 118, 125, 462 A.2d 186 (App.Div.), certif. denied, 94 N.J. 600, 468 A.2d 233 (1983); Honeywell v. Bubb, 130 N.J.Super. 130, 136, 325 A.2d 832 (App.Div.1974). The goal of this policy is "`the notion that the parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone.'" Peskin v. Peskin, 271 N.J.Super. 261, 275, 638 A.2d 849 (App.Div.) (quoting Dep't of Pub. Advocate, supra, 206 N.J.Super. at 528, 503 A.2d 331), certif. denied, 137 N.J. 165, 644 A.2d 613 (1994). Consequently, courts "strain to give effect to the terms of a settlement wherever *488 possible." Dep't of Pub. Advocate, supra, 206 N.J.Super. at 528, 503 A.2d 331.
A settlement between parties to a lawsuit is a contract like any other contract, Nolan, supra, 120 N.J. at 472, 577 A.2d 143, which "may be freely entered into and which a court, absent a demonstration of `fraud or other compelling circumstances,' should honor and enforce as it does other contracts." Pascarella, supra, 190 N.J.Super. at 124-25, 462 A.2d 186 (quoting Honeywell, supra, 130 N.J.Super. at 136, 325 A.2d 832). Consequently, "[i]f a settlement agreement is achieved through coercion, deception, fraud, undue pressure, or unseemly conduct, or if one party was not competent to voluntarily consent thereto, the settlement agreement must be set aside." Peskin, supra, 271 N.J.Super. at 276, 638 A.2d 849; see also Nolan, supra, 120 N.J. at 472, 577 A.2d 143. As to the latter, the longstanding rule is that "`where there is not the mental capacity to comprehend and understand, there is not the capacity to make a valid contract.'" Wolkoff v. Villane, 288 N.J.Super. 282, 287, 672 A.2d 242 (App.Div.1996) (quoting Hillsdale Nat'l Bank v. Sansone, 11 N.J.Super. 390, 399, 78 A.2d 441 (App.Div.1951)). On this score:
The test of capacity to make an agreement. . . is, that a man shall have the ability to understand the nature and effect of the act in which he is engaged, and the business he is transacting. . . . [I]f the mind be so clouded or perverted by age, disease, or affliction, that he cannot comprehend the business in which he is engaging, then the writing is not his deed.
[Eaton v. Eaton, 37 N.J.L. 108, 113 (Sup.Ct.1874).]
Clearly, the party seeking to set aside the settlement agreement has the burden of proving his incapacity or incompetence to contract or other extraordinary circumstance sufficient to vitiate the agreement. Wolkoff, supra, 288 N.J.Super. at 291-92, 672 A.2d 242.
Here, plaintiffs contend that Jennings lacked the mental capacity to consent to settle, that he was coerced into agreement, and that settlement occurred under duress. Significantly, plaintiffs make no claim of fraud, deception or mistake. Nor do they allege disagreement over any term of settlement, much less a material one, or failure to obtain the benefit of their bargain. Rather, their claim of duress may be distilled simply into one of apprehension that counsel would have withdrawn absent Jennings' consent to the agreement. But, here too, there is no allegation that the so-called threat emanated from defendants, their agents, or for that matter, anyone who claims the benefit of the contract. Koewing v. Town of W. Orange, 89 N.J.L. 539, 541, 99 A. 203 (E. & A.1916); Travis v. Unkart, 89 N.J.L. 571, 572-73, 99 A. 320 (E. & A.1916). Nor was the alleged statement attributed to counsel proven wrongful or improper. Restatement (Second) of Contracts § 175 (1981); see also Garshman v. Universal Res. Holding, Inc., 641 F.Supp. 1359, 1364-66 (D.N.J.1986), aff'd, 824 F.2d 223 (3d Cir.1987); Brownell v. Schering Corp., 129 F.Supp. 879 (D.N.J.1955), aff'd, 228 F.2d 624, cert. denied, 351 U.S. 954, 76 S.Ct. 849, 100 L.Ed. 1477 (1956); Gobac v. Davis, 62 N.J.Super. 148, 152-53, 162 A.2d 140 (Law Div.1960). Most importantly, plaintiffs have not established that any such threat by counsel, even if wrongful, subverted Jennings' free will. Restatement (Second) of Contracts, supra, at § 175; see also Rubenstein v. Rubenstein, 20 N.J. 359, 366, 120 A.2d 11 (1956); Smith v. Whitman, 75 N.J.Super. 228, 241, 183 A.2d 89 (App.Div.1962), modified, 39 N.J. 397, 189 A.2d 15 (1963). On the contrary, Jennings made the deliberate *489 choice to sign the settlement agreement after given the option by counsel of rejecting it. Plaintiffs have simply failed to demonstrate that Jennings' election among reasonable alternatives was the product of anything other than his own free will.
And the fact that Jennings was not present when the settlement was later placed on the record does not suggest otherwise. Indeed, formalization in court is not required. See Davidson v. Davidson, 194 N.J.Super. 547, 551, 477 A.2d 423 (Ch.Div.1984). The fact that even an oral agreement is not formalized "upon the record" does not make it any less binding. Pascarella, supra, 190 N.J.Super. at 124, 462 A.2d 186. There is no legal requirement that there be court approval in such a case. DeCaro v. DeCaro, 13 N.J. 36, 43, 97 A.2d 658 (1953). The practice of spreading the terms of the agreement upon the record, although a familiar practice, is not a procedural requisite to either its validity or enforcement. In Pascarella, supra, we stated:
We adopt these principles as consistent with the announced public policy of the jurisdiction favoring settlement of litigation. Settlements of this nature are entered into daily in our courthouse corridors and conference rooms, the court only aware, until informed of the fact of settlement, that counsel and the parties are working toward that desirable end. Adoption of a principle that such agreements are subject to attack because they were not placed upon the record places in unnecessary jeopardy the very concept of settlement and the process by which settlement of litigation is ordinarily achieved.
[190 N.J.Super. at 124, 462 A.2d 186.]
Accord Green v. John H. Lewis & Co., 436 F.2d 389, 390 (3d Cir.1971); Good v. Pa. R.R. Co., 384 F.2d 989, 990 (3d Cir.1967); Main Line Theatres, Inc. v. Paramount Film Distrib. Corp., 298 F.2d 801, 802-03 (3d Cir.), cert. denied, 370 U.S. 939, 82 S.Ct. 1585, 8 L.Ed.2d 807 (1962).
Even the failure to execute release documents does not void the original agreement, or render it deficient from the outset. Execution of a release is a mere formality, not essential to formation of the contract of settlement. See Hagrish v. Olson, 254 N.J.Super. 133, 603 A.2d 108 (App.Div.1992) (a settlement agreement which required defendants to pay a stated sum of money and which barred plaintiffs from pursuing an appeal is enforceable even though the plaintiffs failed to execute general releases). See also Bistricer v. Bistricer, 231 N.J.Super. 143, 146, 151-52, 555 A.2d 45 (Ch.Div.1987) (case was held settled at settlement conference where parties agreed on essential terms, notwithstanding plaintiff's numerous objections to the written agreement).
Thus, absent any competent evidence of fraud, coercion or other unseemly conduct, plaintiffs may avoid the settlement only if lacking the mental capacity to make a valid contract. See Wolkoff, supra, 288 N.J.Super. at 286-87, 672 A.2d 242. However, plaintiffs make no claim that Jennings was without understanding of the terms of the agreement, or otherwise unable to appreciate the nature of the business he was transacting. On the contrary, at the time of execution, Jennings insisted upon, and successfully obtained, modifications to the agreement that benefited plaintiffs. Moreover, nothing in plaintiffs' medical proofs suggests mental incapacity or incompetence to contract. At the very most, Dr. Kuris opined that Jennings suffered anxiety and emotional trauma due to a longstanding mental condition, but nothing in that diagnosis suggests that Jennings, as a result, was unable to comprehend the nature and extent of his acts. And to the extent Dr. *490 Kuris surmised any further, that Jennings was incapable of making a rational decision, the expert's conclusion was an impermissible net opinion, In re Yaccarino, 117 N.J. 175, 196-97, 564 A.2d 1184 (1989); Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981); Jimenez v. GNOC Corp., 286 N.J.Super. 533, 542-43, 670 A.2d 24 (App.Div.), certif. denied, 145 N.J. 374, 678 A.2d 714 (1996), lacking a sufficient factual foundation, Smith v. Estate of Kelly, 343 N.J.Super. 480, 497-98, 778 A.2d 1162 (App.Div.2001).
Having determined that there are no other bars to enforcement of the settlement agreement in this case, we next address the only remaining issue, namely, whether Sylvia Jennings' counsel of record and her spouse were authorized to enter into such an agreement on her behalf. It is well settled that "stipulations . . . made by attorneys when acting within the scope of their authority are enforceable against their clients." Carlsen v. Carlsen, 49 N.J.Super. 130, 137, 139 A.2d 309 (App.Div.1958) (emphasis added); Davidson, supra, 194 N.J.Super. at 551, 477 A.2d 423; see also 7A C.J.S. Attorney and Client, § 205-208, 211 (1980). The general concept has been historically and unqualifiedly accepted in our court. As early as 1888, in Phillips v. Pullen, 50 N.J.L. 439, 14 A. 222 (E. & A. 1888), a defendant, who gave his lawyer general instructions to negotiate a settlement in a tort action, was bound by the agreement made by his attorney on his behalf where the defendant, after learning of the lowest sum plaintiff would accept, instructed the attorney to settle on the best terms he could obtain. In Bernstein & Loubet, Inc. v. Minkin, 118 N.J.L. 203, 205, 191 A. 733 (E. & A.1937), the Court stated: "But it is the clear policy of our courts to recognize acts by the attorneys of the court as valid and presumptively authorized and, unless the contrary appears, it will be presumed that a stipulation was duly authorized." See also Honeywell, supra, 130 N.J.Super. at 136, 325 A.2d 832. Consequently, an attorney is presumed to possess authority to act on behalf of the client, Sur. Ins. Co. of Cal. v. Williams, 729 F.2d 581, 582-83 (8th Cir.1984); Bernstein & Loubet, supra, 118 N.J.L. at 205, 191 A. 733, and the party asserting the lack of authority must sustain "a heavy burden to establish that [her] attorney acted without any kind of authority in agreeing to the entry of judgment in the trial court," Sur. Ins. Co., supra, 729 F.2d at 583; see also McKenna v. Pac. Rail Serv., 817 F.Supp. 498, 520 (D.N.J.1993). This, plaintiffs here failed to do.
Plaintiffs have also failed to prove that Jennings lacked either actual or apparent authority to consent to a settlement on his wife's behalf. Actual authority (express or implied) may "be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." Restatement (Second) of Agency § 26 (1958). On the other hand, "apparent authority . . . is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Id. at § 27. In other words, "[a]pparent authority imposes liability, not as the result of an actual contractual relationship, but because of actions by a principal which have misled a third party into believing that a relationship of authority does, in fact, exist." Wilzig v. Sisselman, 209 N.J.Super. 25, 35, 506 A.2d 1238 (App.Div.), certif. denied, 104 N.J. 417, 517 A.2d 415 (1986).
*491 Here, on the eve of a peremptory trial date, Sylvia Jennings, by her own admission, expressly authorized her husband to appear in court and negotiate the terms of a settlement. Her husband confirms this grant of settlement authority. Moreover, Sylvia appeared with her husband jointly throughout the pre-trial phase through the same record counsel who represented them and negotiated the settlement at the final pre-trial session. Separate and apart from Jennings' express authority, Sylvia, by her own conduct, placed her husband in a position such that opposing counsel and the court were justified in presuming Jennings had the requisite authority. See Am. Well Works v. Royal Indem. Co., 109 N.J.L. 104, 108, 160 A. 560 (E. & A.1932); Shadel v. Shell Oil Co., 195 N.J.Super. 311, 316, 478 A.2d 1262 (Law Div.1984). Her belated, conclusionary allegation that she withheld authority to place the settlement on the record is simply too little, too late.
We are satisfied that plaintiffs have failed to present any competent evidence of a lack of either mental capacity, free will, or authority to contract sufficient to vitiate the settlement agreement in issue. Absent proof of any disagreement with the bargain struck, we are left only with plaintiffs' "second thoughts [which, quite simply,] are entitled to absolutely no weight as against our [strong public] policy in favor of settlement." Dep't of Pub. Advocate, supra, 206 N.J.Super. at 530, 503 A.2d 331.
Affirmed.
NOTES
[1] In addition to John and Rebecca Reed, husband and wife, named defendants were James Reed, a brother; J.R. Land, Inc., a related excavation company; Robert Rosania, Jr. and Al Wolfe, who are associated with J.R. Land, Inc.; GPU Energy, Inc.; and Independent Tree Services, Inc., GPU's tree removal contractor.