**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3753-19

BCB COMMUNITY BANK,

    Plaintiff-Respondent,

v.

NICHOLAS CALANDRILLO
and PATRICIA M.
CALANDRILLO,

    Defendants-Appellants.

_____

Submitted April 27, 2021 – Decided June 2, 2021

Before Judges Mawla and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Sussex County, Docket No. L-0151-18.

James Mahon, attorney for appellants.

Braverman and Lester, attorneys for respondent (Jeffrey A. Lester and Bert Binder, on the brief).

PER CURIAM

This deficiency action relates to mortgaged property previously owned by defendants Nicholas and Patricia M. Calandrillo[1] in Andover. Defendants appeal a May 15, 2019 Law Division order that granted plaintiff BCB Community Bank partial summary judgment and dismissed defendants' counterclaims sounding in violations of the Dodd Frank Act (DFA), Truth in Lending Act (TILA), the New Jersey Home Ownership Security Act of 2002 (HOSA), and Regulation Z, 12 C.F.R. § 226.34(a)(4), 12 C.F.R. § 226.35(a), (b), and an April 13, 2020 amended order of final judgment awarding plaintiff $186,438.02. On appeal, defendants argue that the trial court erred by: 1) dismissing their counterclaims; and 2) failing to conduct a fair market value hearing with respect to the Andover property. We disagree with all of defendants' arguments and affirm.

I.

In order to place defendants' appellate arguments, and particularly their lender liability-based counterclaims in proper context, we discuss at some length the procedural history and motion record before the court. In 2003, defendants spoke with their longtime accountant Mark Hogan regarding the purchase of a

---

[1] We utilize the defendants' first names in order to differentiate them because they share a common surname, intending no disrespect.

house in Sparta (Sparta property). At that time, Hogan was a member of plaintiff's board of directors. Plaintiff issued a commitment letter for a mortgage in the amount of $1,370,000, conditioned on an appraisal valuing the property for at least $1,712,500.

Jordan Real Estate Group (JRE) appraised the property at approximately $2,000,000, and plaintiff approved defendants' loan application. On July 16, 2003, defendants closed on the Sparta property for a final purchase price of $2,100,000. Nicholas testified at deposition that throughout their period of ownership, defendants made approximately $500,000 worth of improvements to the property.

In 2011, defendants decided to downsize and discussed applying for a second loan with plaintiff for the purchase of a residence in Andover. Prior to submitting a mortgage application, however, defendants entered a contract to purchase the Andover property for $1,100,000. At the time defendants executed the contract, approximately $1,209,870 remained on the Sparta mortgage.

Defendants ultimately applied for a mortgage from plaintiff for the Andover property. At the time of the application, defendants indicated that they intended to sell the Sparta property and listed the home for a price that would satisfy the outstanding mortgage balance. As part of the mortgage application

3

process, JRE completed an appraisal, and valued the Andover property at $1,175,000.

On May 20, 2011, Nicholas emailed Hogan and stated "[w]e need a letter that states that [plaintiff] has preapproved Nicholas and Patricia . . . for a mortgage of $850,000 for the purchase of the [Andover property]." On June 22, 2011, Gerardo Nestico, an Assistant Vice President for plaintiff, responded to Hogan:

> I just submitted the application . . . . The loan is not sellable on the secondary market due to [Nicholas'] credit, . . . and that the loan is considered a jumbo. I will be presenting this loan along with several others at the next loan committee meeting next week.
>
> I am requesting a rate of 5.75% over . . . [thirty] years. In addition, [Nicholas] has several large credit cards that effect his debt to [income] ratio that I will ask/require to pay at closing. According to his credit, he pays [approximately] [$]20,000 per month in debt.
>
> I am working on it today, but wanted to keep you in the loop. [Nicholas] and I have been in touch daily, so I [am] working on his documents.

That same day, Hogan replied:

> I believe the credit cards are all paid by his business . . . . Also, he will be selling his primary house in Sparta and obviously will satisfy his current mortgage with [plaintiff]. This purchase is part of his downsizing as his kids are grown and he is gearing up

for retirement. Considering the credit it may be easier
to sell the committee on a rate of [six] percent.

Nestico then emailed a colleague requesting that they "get proof on what credit cards are paid through [Nicholas'] business" and noted that "the rate will be 5.875% not 5.75%."

Defendants' loan application for the Andover property listed their joint monthly income at $38,833.33 and valued the Sparta residence at $2,000,000. Defendants signed the application on June 27, 2011 and initialed each page. Defendants include in their appendix an additional unsigned and undated loan application, which they allege was prepared by Hogan, for the Andover property. This unsigned application lists the value of the Sparta residence at $3,200,000 and includes a monthly bonus of $16,000, in addition to the defendants' joint monthly income. As we discuss infra, at pp. 12-13, this application was not introduced during the summary judgment proceedings, nor did defendants seek to supplement the appellate record to include this unsigned application.

On September 16, 2011, defendants executed an $880,000 promissory note issued by plaintiff and secured by a mortgage on the Andover property. The note included a 5.875% interest rate and monthly payments of $5,205.53. In February 2012, defendants sold the Sparta property for approximately

5

$2,200,000 and satisfied the outstanding mortgage. From November 11, 2011 through February 2012, defendants made monthly payments on both mortgages.

Defendants continued to make the monthly mortgage payments on the Andover property until they defaulted in August 2014. Defendants subsequently requested a loan modification claiming Nicholas' company's largest client filed for bankruptcy in 2011. In addition, Nicholas informed plaintiff that another company client, which had been the source of significant income, had been sold and the successor company no longer required his services.

Nicholas stated that due to the loss of business income, he was forced to close his company in 2013, had personally been without income for ten months, and had depleted his savings. Despite these financial setbacks, defendants stated they were assisting their son in the formation of his own company and that Patricia had received a teaching position. Nicholas also claimed that he had listed the Andover residence for sale.

Based on this information, plaintiff granted defendants an eight-month period of forbearance on their Andover mortgage obligation from August 2014 through March 2015. During this period, defendants were not required to make principal or interest payments but remained obligated to make escrow payments, including insurance and tax payments. The terms of the forbearance agreement

6

were included in a December 4, 2014 workout agreement, where plaintiff agreed to reduce the monthly payment of the Andover property mortgage. Part of that agreement included a provision that defendants agreed to waive "any claims of bad faith, fraud, duress, lender liability or excess of control" against plaintiff.

In March 2015, Nicholas requested plaintiff forbear on enforcing its rights under the note and mortgage for an additional six months. He notified plaintiff that the Andover property had not sold and was still listed for sale. He also stated that his wife was earning $60,000 a year from her teaching position, "his son's business had not yet taken off," and he was not receiving any paychecks from his son for work he performed. Plaintiff granted the forbearance request consistent with the terms and conditions of the first forbearance, but also included a balloon payment on the loan's original maturity date for all missed payments during the forbearance period.[2] On August 30, 2016, defendants purchased a house in Newton.

Defendants resumed payments on the note after the expiration of the second forbearance period. Defendants did not sell their Andover residence and

---

[2] The second forbearance agreement is not included in the record. In Judge David J. Weaver's May 15, 2019 written statement of reasons, however, he noted that the second forbearance agreement included the same waiver language as contained in the first agreement.

continued to make payments on the note until they defaulted again in April 2017. After defendants failed to make their May 2017 payment, plaintiff sent a notice of intent to foreclose and commenced foreclosure proceedings on July 25, 2017. Defendants never answered the foreclosure complaint, nor did they assert any cross-claim against plaintiff sounding in lender liability or otherwise, and a default judgment was entered in plaintiff's favor.

On August 21, 2017, Nicholas informed plaintiff that he had found a purchaser for the Andover residence and requested a pay-off statement. He further noted that he could no longer make insurance payments for the property and, consequently, plaintiff was forced to obtain the necessary coverage. In September 2017, he told plaintiff that he had a contract in place to sell the Andover residence for $890,000 and sought approval for a short sale. Plaintiff requested a copy of the contract and forwarded a Housing and Urban Development form confirming that the sale proceeds would go to plaintiff to satisfy the existing mortgage.

On November 6, 2017, Nicholas notified plaintiff that the sale fell through because the home required significant repairs. Thereafter, on November 28, 2017, a judgment of foreclosure was entered in favor of plaintiff for $895,253.83. A writ of execution was issued, served on defendants, and a notice

of sale was published.  In December 2017, however, despite the final judgment

of foreclosure, plaintiff agreed to a short sale of the property on the following

conditions:

> (i) [Plaintiff] be paid $802,000 from the sale proceeds
> and that the [defendants] would execute a note for an
> additional $34,320.64 to be secured by a first mortgage
> on [the Newton property] which mortgage was to [be]
> amortized over a term of ten years with interest at [four
> percent] annum; [(ii)]  Defendants . . . submit current
> financials in order to determine their ability to pay and
> also provide a current statement from Homebridge
> Financial indicating the status of the existing loan;
> [(iii)] [plaintiff] . . . waive[s] existing late fees of
> $1821.60[.]

After the second sale fell through, on February 26, 2018, the property was

sold at a duly noticed sheriff's sale.  Prior to the sale, plaintiff conducted an

appraisal that valued the Andover property at $735,000, which was subsequently

credited to defendants.  Plaintiff, as the only bidder, received a sheriff's deed to

the Andover property for $100.  The report of sale for the property indicated a

deficiency of $926,338.03, which included the $895,253.83 foreclosure

judgment, $17,241.37 in contract interest, $8,450 in taxed cost, and $572.72 in

sheriff's fees, minus the $100 sale price.

Plaintiff subsequently listed the Andover property, at the recommendation

of its broker, for $825,000.  After negotiations with a potential buyer, plaintiff

agreed to sell the property "as is" for $700,000. On March 28, 2018, plaintiff filed a deficiency action against defendants for $191,338.03. Defendants filed an answer and subsequently filed a second amended answer with counterclaims and a third-party complaint against JRE. Defendants claimed that plaintiff improperly appraised both the Sparta and Andover properties and violated state and federal laws when it granted them the loans for those properties.

On February 19, 2019, plaintiff made an offer of judgment to defendants pursuant to Rule 4:58-1, in the amount of $120,000. After defendants failed to respond, plaintiff filed a motion for partial summary judgment to dismiss defendants' counterclaims. After considering the parties' submissions and oral arguments, Judge Weaver issued an order and written statement of reasons on May 15, 2019, that granted plaintiff's application and dismissed defendants' counterclaims with prejudice.[3]

Judge Weaver rejected defendants' claim that the plaintiff had violated the DFA and TILA and noted that defendants' arguments were based on alleged violations of Regulation Z, and particularly 12 C.F.R. § 226.34(a)(4) and 12

_____

[3] Defendants' merits brief does not challenge the court's dismissal of their HOSA claim. We accordingly do not address the dismissal of this claim, and deem any challenge waived. Jefferson Loan Co. v. Session, 397 N.J. Super. 520, 525 n.4 (App. Div. 2008); Zavodnick v. Leven, 340 N.J. Super. 94, 103 (App. Div. 2001).

C.F.R. § 226.35(a) and (b). Specifically, defendants maintained that plaintiff violated these federal regulations by granting "a loan that imposed a debt to income . . . ratio [(DTI)] exceeding [forty-three] percent" and by "failing to adequately consider [their] ability to repay the [Andover] loan." Plaintiff, however, asserted that the regulations did not apply to the Sparta or Andover loans because "they were not enacted until after the loans were issued."

Judge Weaver found that Regulation Z did not apply to the 2003 Sparta loan because the regulation did not become effective until October 1, 2009. The judge also determined that Regulation Z's DTI requirement did not apply to the Andover loan because the rule was not amended to prohibit a DTI exceeding forty-three percent until 2013. Judge Weaver further concluded that defendants failed to provide any supporting evidence to establish that plaintiff violated Regulation Z by failing to adequately consider their ability to repay the Andover loan.

The judge found unpersuasive defendants' assertion that Nestico testified regarding his concerns of defendants' bad credit and debt and that they "were overridden by [Hogan's] representations that [Nicholas'] business . . . paid for all of [defendants] personal credit cards," because "neither party entered Nestico's deposition testimony into the record." Nonetheless, Judge Weaver

11

found that the email communication between Hogan and Nestico contradicted defendants' claim in any event. Specifically, the judge found that the email correspondence indicated that Nestico "did not put his blind faith in Hogan's statement, but rather sought confirmation on which credit cards were paid for by [Nicholas'] business."

Judge Weaver also rejected defendants' argument that Hogan "prepared an unsigned loan application on [d]efendants' behalf that falsely reported that [Nicholas] received a $16,000 monthly bonus." The judge found that the copy of the loan submitted by defendants did not report this bonus. In addition, Judge Weaver noted that "[d]efendants have not submitted a copy of the mortgage application that was allegedly forged by Hogan, nor have they provided a transcript of Nestico's deposition testimony that allegedly 'identified' the application."

Plaintiff also argued that defendants "waived any claims they may have had" based on the waiver language contained in the two forbearance agreements. Judge Weaver rejected defendants' contention that enforcement of the waiver provisions was barred under Gonzalez v. Wilshire Credit Corporation, 207 N.J. 557 (2011). The judge concluded that defendants had "not alleged, much less

supported, any facts that suggest that the negotiation or execution of the forbearance agreements [were] in any way unjust."

On October 7, 2019, the parties agreed to a settlement agreement regarding the deficiency action. At a hearing to discuss the parties' agreement, Nicholas testified that he understood the settlement, agreed to all of its terms, and that he was not entering the agreement under duress. In addition, Nicholas acknowledged that by entering the settlement agreement, he gave "up the right to have a hearing on fair market value."

On October 21, 2019, Judge Weaver entered an order memorializing the settlement. The pertinent terms of the settlement included: 1) a reduction in the $926,438.02 deficiency[4] by the amount of the February 14, 2018 fair market value of the Andover property; 2) an independent court appointed appraiser would determine the February 14, 2018 fair market value of the property; and 3) the appraiser would "endeavor to do an on-site inspection of the premises and toward that, [p]laintiff and its counsel shall cooperate in attempting to arrange the same."

---

[4] The report of sale listed the deficiency at $926,338.03. Defendants, however, do not dispute the amount in the settlement agreement.

A-3753-19

On January 3, 2020, the court appointed appraiser issued a report valuing the Andover property at $740,000. The appraiser noted, however, that he was unable to gain permission from the current owners to inspect the property despite efforts made by plaintiff's counsel. Consequently, the appraiser relied upon "various documents including previous appraisals, photo surveys, and listing information" to determine the property's fair market value.

On April 13, 2020, Judge Weaver entered an amended order for entry of final judgment granting plaintiff a deficiency judgment of $186,438.02, plus costs of $250. In addition, the judge awarded plaintiff counsel fees in the amount of $23,607.50. This appeal followed.

## II.

Defendants argue in their first point that Judge Weaver erred in granting plaintiff partial summary judgment and dismissing their counterclaims as there were genuine issues of material fact warranting a trial. As best we can discern, defendants assert there were disputed factual issues as to whether plaintiff falsified information in defendants' mortgage application for the Andover property. On this point, defendants rely again on the unsigned loan application, Nestico's deposition testimony, email correspondence between Nestico and Hogan, and minutes from plaintiff's loan committee meeting as evidence that

14

plaintiff misrepresented their income, the value of the Sparta residence, and their household DTI ratio.

Defendants also argue that Judge Weaver failed to consider plaintiff's purported violations of federal law and regulations. Defendants appear to reassert their claim that plaintiff failed to consider defendants' ability to repay the Andover loan. We find that these arguments are without sufficient merit to warrant extended discussion in a written opinion, Rule 2:11-3(e)(1)(E) and affirm substantially for the reasons detailed in Judge Weaver's comprehensive written statement of reasons. We provide the following comments to amplify our decision.

We review "an order granting summary judgment in accordance with the same standard as the motion judge." N.J. Transit Corp. v. Certain Underwriters at Lloyd's London, 461 N.J. Super. 440, 452 (App. Div. 2019) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)). Rule 4:46-2(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Where there is no issue of material fact and only a question of law remains, we give "no

special deference to the legal determinations of the trial court." Newton Med. Ctr. v. D.B., 452 N.J. Super. 615, 620 (App. Div. 2018) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Based upon our de novo review of the competent and submitted materials in the motion record, we likewise conclude, as Judge Weaver found, the motion record failed to raise a genuine issue of material fact as to any of defendants' counterclaims. We note, as did Judge Weaver, that defendants failed to submit the unsigned loan application or Nestico's complete deposition testimony into the record at the time the summary judgment motion was decided. We note that defendants, without seeking to supplement the record, see Rule 2:5-5, included Nestico's deposition testimony in the record on appeal.

Although we do not ordinarily consider evidence that was not part of the record in the trial court, Liberty Surplus Ins. v. Nowell Amoroso, P.A., 189 N.J. 436, 452 (2007) (citing R. 2:5-4), for the sake of completeness, we find that Nestico's deposition fails to provide any support that plaintiff falsified information in defendants' mortgage application. Indeed, when questioned about the unsigned mortgage application, Nestico merely identified the information contained in the document. Critically, Nestico did not provide any

testimony as to who completed the application or whether plaintiff relied on the document in granting defendants' loan.

In addition, we concur with Judge Weaver that defendants failed to present evidence which raised "a triable issue of material fact," regarding plaintiff's violation of federal law, and accordingly, it was entitled to summary judgment precluding defendants from asserting violations of DFA, TILA, or Regulation Z. In this regard, defendants have failed to provide any binding or persuasive authority to support their claim that Judge Weaver erroneously concluded that plaintiff was not prohibited from issuing a loan with a DTI ratio above forty-three percent until 2013.

Further, Judge Weaver appropriately determined defendants' claim that plaintiff failed to consider their ability to repay the Andover loan was contradicted by Nestico's email indicating he sought confirmation on Nicholas's ability to pay his credit card debt. The judge also correctly concluded that defendants failed to provide any support suggesting that the two forbearance agreements which expressly stated that defendants waived "any claims of bad faith, fraud, duress, lender liability or excess control against the [l]ender based upon any events that occurred prior to the execution of this [a]greement," were in any way improper in their formation or otherwise unjust.

17

Finally, we note that plaintiff also claims that defendants' counterclaims are barred by the entire controversy doctrine, see Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman and Stahl, P.C., 237 N.J. 91, 98 (2019), as they failed to raise those claims in the underlying foreclosure proceeding. Because we have concluded that Judge Weaver properly dismissed the counterclaims for the reasons detailed in his May 15, 2019 opinion, and for those discussed supra, we do not address this alternative argument.

III.

In their second point, defendants' assert that Judge Weaver erred by not allowing a hearing to determine the fair market value of the Andover property and for not requiring an in-home inspection of the property. We disagree.

"A settlement agreement between parties to a lawsuit is a contract." Nolan v. Lee Ho, 120 N.J. 465, 472 (1990). The construction and interpretation of a settlement agreement is a matter of law and is subject to de novo review on appeal. Kaur v. Assured Lending Corp., 405 N.J. Super. 468, 474 (App. Div. 2009); see also Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014) ("When a trial court's decision turns on its construction of a contract, appellate review of that determination is de novo."). We "give 'no special deference to the trial court's interpretation and look at the contract with fresh eyes.'"

Manahawkin Convalescent, 217 N.J. at 115 (quoting Kieffer v. Best Buy, 205 N.J. 213, 222 (2011)).

"[T]he settlement of litigation ranks high in our public policy," and we "strain to give effect to the terms of a settlement wherever possible." Brundage v. Est. of Carambio, 195 N.J. 575, 601 (2008) (citations omitted). "Our strong policy of enforcing settlements is based upon 'the notion that the parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone.'" Ibid. (quoting Peskin v. Peskin, 271 N.J. Super. 261, 275 (App. Div. 1994)).

The interpretation of a settlement agreement is "governed by basic contract principles." Capparelli v. Lopatin, 459 N.J. Super. 584, 603 (App. Div. 2019). "[A]bsent a demonstration of 'fraud or other compelling circumstances,' a court should enforce a settlement agreement as it would any other contract." Id. at 603-04 (quoting Jennings v. Reed, 381 N.J. Super. 217, 227 (App. Div. 2005)). "Courts enforce contracts 'based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.'" Manahawkin Convalescent, 217 N.J. at 119 (quoting Caruso v. Ravenswood Devs., Inc., 337 N.J. Super. 499, 506 (App. Div. 2001)). A reviewing court must consider contractual language "in the context of the

circumstances at the time of drafting . . . ." In re Cnty. of Atlantic, 230 N.J. 237, 254 (2017) (internal quotation marks and citations omitted). "[W]hen the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result." Capparelli, 459 N.J. Super. at 604 (quoting Quinn v. Quinn, 225 N.J. 34, 45 (2016)).

Defendants' argument completely ignores the terms of the parties' settlement agreement in which they agreed that the fair market value of the Andover property would be established by a court appointed appraiser. The agreement further provided that "[t]he independent [c]ourt-appointed appraiser shall endeavor to do an on-site inspection of the premises and toward that, [p]laintiff and its counsel shall cooperate in attempting to arrange the same." Nicholas acknowledged that by agreeing to the settlement, he waived his right to a hearing on the fair market value.

Here, the appraiser was only required to attempt an on-site appraisal, with the assistance of plaintiff's counsel. As the record indicates, despite plaintiff's counsel's best efforts, he was unable to obtain permission to conduct an on-site appraisal from the current occupants of the Andover property. Accordingly, the appraiser relied upon "various documents including previous appraisals, photo

surveys, and listing information" to determine the property's value at $740,000. We are satisfied that the judge's decision not to conduct a hearing to determine the fair market value, and his findings supporting the final judgment, are amply supported by the record. Finally, to the extent we have not addressed any of defendants' remaining arguments, it is because we have concluded they are of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3753-19